**The PEOPLE in the State of South Dakota In the Interest of D.M., a Child; and Concerning F.M., Mother.**

**No. 14688.**

Supreme Court of South Dakota.

Considered on Briefs March 7, 1985.

Decided May 8, 1985.

Janice Godtland, Asst. Atty. Gen., Pierre, for state of S.D.; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

Jane M. Farrell, Hot Springs, for child D.M.

Gerald M. Baldwin of Baldwin & Kelley, Custer, for appellant mother.

WUEST, Acting Justice.

This is an appeal from a dispositional order terminating the parental rights of F.M., with regard to her daughter D.M. We affirm.

In August of 1983, the South Dakota Department of Social Services (Department) was informed that D.M. and her brother M.M. were involved in an incestuous relationship. An investigation revealed that this relationship began sometime in 1976 or 1977. Subsequently, D.M. remained with F.M., her mother. M.M. moved from F.M.'s home and Department began providing services to D.M. and F.M. At the time of this appeal, D.M. was thirteen years old and had completed the sixth grade.

F.M. has given birth to ten children, two of whom died in infancy. An eleven-year-old daughter died of head injuries she apparently sustained while riding a horse. F.M., however, maintains the child was murdered by her ex-husband's brother and she has threatened vengeance against him. F.M. is a widow. Her second husband, who is the father of nine of her children, died in 1974. Her oldest child was fathered by her brother.

A psychological evaluation of F.M. revealed an individual who strives for dominance and tends to withdraw from the world because of feelings of suspicion toward others. Tests indicated that F.M. feels threatened and unsafe around people, especially adults, and that she believes she is often persecuted. She views people as generally disloyal, untrustworthy and dangerous to her physical and material safety.

Several of F.M.'s children had brushes with the law, including sexual "acting out," drug use, and theft. The children also had truancy problems because F.M. did not believe that school was important. Department was first involved with F.M.'s daughter, D.M., in 1978 because at the age of seven she was not attending school.

In September of 1983, F.M. admitted herself to the Custer County Community Hospital. She told the admitting physician that she was seriously considering killing her daughter, D.M., her granddaughter, A.K., and herself. On September 6, Dr. Robert Noteboom-Harris, a psychologist with West River Mental Health, interviewed F.M. to determine whether she was a continuing danger to D.M. and A.K. F.M. told the psychologist that she had considered killing the two children to protect them from any harm that might befall them after her death. She explained that her son-in-law, D.K., had seriously injured both children, and that he was a threat to her family. Dr. Noteboom-Harris had been treating two of F.M.'s sons, and in interviews with them he learned that D.K. had threatened to kill virtually every member of F.M.'s family, had brandished knives and guns, and had in fact injured D.M. and A.K.

Dr. Noteboom-Harris stated that although F.M. was not actively homicidal and suicidal, another crisis would cause these tendencies to recur and F.M. would again consider killing the two children. He said that the apparent resolution of a suicidal crisis does not significantly reduce the potential for later suicide, and that when homicide is involved the likelihood of recurrence within ninety days is very real. He added that when the suicidal person is in a family situation where incest is a factor the likelihood of recurrence is even greater. The psychologist concluded that F.M. presented a serious physical and psychological threat to D.M. and A.K.

On September 12, 1983, D.M. was placed in foster care and F.M. admitted herself to the psychiatric unit at Rapid City Regional Hospital West, where she remained until October 7, 1983. Dr. Charles Lord, a psychiatrist, administered various psychological tests to F.M. He found that F.M. had made progress, was motivated to continue to improve, and that with structure and support she could provide adequate care for the children. He also expressed the opinion that the children should be removed if F.M. did not demonstrate on-going stability.

On October 20, 1983, D.M. was returned to F.M.'s physical custody. Department, however, retained legal custody of D.M. Thereafter, Virgena Sage (Ms. Sage), a social worker with Department, entered into a service plan with D.M. and her mother. Under this plan, D.M. was to attend weekly counseling sessions with Sharon Hansen (Ms. Hansen) at West River Mental Health and with Ms. Sage. D.M. was to attend school and raise her grades. F.M. agreed to attend weekly counseling sessions with Ms. Hansen, to provide support for D.M., and meet twice a month with Ms. Sage.

During her weekly meeting with Ms. Sage in February 1984, D.M. expressed concern for her mother's emotional state. She explained that F.M. was depressed because her son, M.M., and granddaughter, A.K., were no longer with her and because of the strain of the court action. D.M. was concerned that her mother was again becoming suicidal and asked to be placed elsewhere. D.M. was again placed in foster care on February 16, 1984.

From September 1983 through June 1984, Ms. Hansen provided weekly counseling sessions to D.M. Ms. Hansen stated that at first D.M. was depressed and had thoughts of suicide or running away. She said that D.M. was very desperate, withdrawn, and socially isolated. Ms. Hansen explained that while it is not unusual for adolescents to have passing thoughts of suicide, D.M.'s were different, in that she saw no value in living.

D.M. made a great deal of progress in the counseling sessions. No longer was she suicidal and she valued her life. Ms. Hansen stated that at first D.M. had a great deal of anger concerning her sexual abuse, which also greatly affected her self-esteem. Both of these areas improved with counseling. Ms. Hansen also worked toward helping D.M. deal with the anger she expressed about her conflicting feelings and environment.

Ms. Hansen also met with F.M. for sixteen or seventeen sessions, beginning in October of 1983. She worked on F.M.'s

depression and parenting skills, stating that F.M.'s depression interfered greatly with her duties as a parent. Ms. Hansen said that F.M. was somewhat less depressed after counseling, but made minimal long-term progress. F.M. discontinued therapy of her own accord.

Ms. Hansen described the M. family relationship as hostile-dependent. The family members were close and dependent upon each other for survival, yet there was an underlying anger in each individual that was expressed in very destructive ways.

Both Ms. Hansen and Ms. Sage recommended that F.M.'s parental rights in D.M. be terminated. On June 28, 1984, at the dispositional hearing, D.M. testified that she made the decision to be removed from her mother's care in February and that she would not mind visits from her mother, but did not wish to live with her.

The trial court terminated F.M.'s parental rights at the dispositional hearing and F.M. appeals, contending: (1) that the trial court's findings of fact do not support its conclusions of law; (2) the findings do not comport with the requirements of SDCL 26–8–35.2; and (3) the termination of F.M.'s parental rights is not the least restrictive alternative. We disagree.

The trial court's dispositional findings of fact state that, based on clear and convincing evidence, the allegations in the request for the termination of F.M.'s parental rights are true and supported by the evidence and the evidence presented supports the need for further disposition of D.M. The findings further state that D.M. was found to be dependent and neglected, as defined in SDCL 26–8, because "her environment is injurious to her welfare" and that reasonable efforts were made to prevent or eliminate the need for D.M.'s removal from her mother's home. Finally, the conditions which led to D.M.'s removal

still exist and there is little likelihood that they will be remedied.

Based on these findings, the trial court made conclusions of law sustaining the petition and entering an order of disposition which stated that "it is in the best interest of [D.M.] that the parental rights of [F.M.] be terminated" and that "the child will be placed with the Department of Social Services with instruction to receive permanent planning either through adoption, Casey Foundation, or some other viable alternative."

■ Findings of fact made by a trial court in this type of dispositional proceeding are binding upon this court unless we are satisfied that they do not meet the standard of clear and convincing evidence. *Matter of J.W.W.*, 334 N.W.2d 513 (S.D. 1983); *People in Interest of S.H.*, 323 N.W.2d 851 (S.D.1982); see also *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The question for this court's determination is not whether we would have made the same findings as the trial court, but whether in view of the entire evidence we are left with a firm and definite conviction that a mistake has been made. *Matter of J.M.A.*, 286 N.W.2d 324 (S.D.1980); *People in Interest of T.C., Etc.*, 278 N.W.2d 452 (S.D.1979); see also *Cunningham v. Yankton Clinic, P.A.*, 262 N.W.2d 508 (S.D.1978); *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970).

■ The dispositional findings of fact are poorly drafted and incomplete.* We have very seriously considered remanding this case for further findings; however, such a remand would merely keep the child's custody in limbo for an undetermined period and the evidence is overwhelming and largely uncontradicted. The record is replete with competent evidence warranting the termination of F.M.'s pa-

---

* We do caution the trial courts to make full and complete findings of fact rather than skeletal findings. It appears these findings of fact were drafted by the state's attorney, which is common practice in this state. The trial courts should not hesitate to direct state's attorneys to prepare complete findings.

rental rights over D.M. Indeed, the incest that occurred, the threats of homicide and suicide within the family, and the overall tenor of the family relations compel the conclusion that it is in D.M.'s best interest that F.M.'s parental rights be terminated and D.M. be placed in a stable environment. In view of the entire evidence, which we find clear and convincing, we hold that the trial court's findings of fact were sufficient to support its conclusions of law.

■ F.M. also argues that the trial court's findings do not comport with SDCL 26–8–35.2 because the statute requires that the child be in the legal custody of Department for eighteen months. We find this argument of no merit, given the fact that we construed this requirement in *Matter of M.S.M.*, 320 N.W.2d 795 (S.D.1982), as a maximum limit on foster care and not a minimum. Its purpose is to prevent children from languishing in the uncertainty of foster care.

■ Finally, F.M. contends that the termination of her parental rights is not the least restrictive alternative. Parental rights may be terminated upon a showing that there is no narrower means of providing for the best interests and welfare of the child, and that services to the family are unavailing. *In re M.S.M., supra; Matter of R.Z.F.*, 284 N.W.2d 879 (S.D.1979); *Matter of N.J.W.*, 273 N.W.2d 134 (S.D. 1978). Extensive efforts were made by Department to counsel F.M. so that she could provide proper parenting to D.M. These efforts, however, were to no avail and it is clear that F.M. cannot function adequately as a mother to D.M. in the eyes of the law.

Accordingly, the judgment and order of the trial court are affirmed.

FOSHEIM, C.J., and WOLLMAN and MORGAN, JJ., concur.

HENDERSON, J., deeming himself disqualified did not participate.

