502 N.W.2d 860 (1993)
In the Matter of J.Y., Abused or Neglected Child.
No. 18025-a.
Supreme Court of South Dakota.
Considered on Briefs February 10, 1993.
Decided June 30, 1993.
*861 Dale A. Wein of Ronayne and Richards, Aberdeen, for appellant.
Mark Barnett, Atty. Gen., Joan P. Baker, Asst. Atty. Gen., Pierre, for appellee, State of South Dakota.
MILLER, Chief Justice.
T.Y. (hereinafter "Mother") appeals an order terminating her parental rights in J.Y. We affirm.

FACTS
Mother is 27 years old and has borderline intellectual functioning (bordering on mental retardation). She also has "deeply ingrained mental disorders" including paranoia, obsessive/compulsiveness, and dependent personality disorder. These characteristics make it difficult for Mother to make decisions and to take responsibility for her own life. Psychiatrist Thomas Price testified that these personality disorders are difficult to treat and only long-term intensive counseling would have any results. Dr. Price testified that Mother's borderline intellectual functioning would further impair any counseling process. Under ideal conditions he would expect only "minimal improvement" after five or six years of treatment.
Three years ago, Mother's parental rights for her first child (S.Y.) were terminated. In that case, S.Y. was approximately one year old when she was removed from Mother. The Department of Social Services' (hereinafter "Social Services") attempts to provide services were unavailing. The circuit judge in that prior termination case found Mother was physically abusive, failed to provide for the "basic needs" of the child, and "the child's environment [was] injurious to her welfare." It was clear from the record that Mother's difficulties with the first child were largely related to her borderline mental functioning and her mental disorders. This Court affirmed that termination of parental rights in appeal number 17254 on February 22, 1991. When considering the present action, Judge Berndt took judicial notice of the record in that prior termination case.
Mother became pregnant in early 1991 and Social Services provided her with parental training courses and other support services. Social Service workers became concerned about Mother's medical condition because she was involved in a physically abusive relationship and she failed to attend certain prenatal checkups. Social Service workers were also very concerned because Mother's parenting skills were essentially unchanged from when her parental rights to S.Y. were terminated three years earlier.
J.Y. was born with no complications on October 6, 1991. Social Services immediately obtained a detention order. On October 29, 1991, Social Services filed a petition alleging J.Y. was dependent and neglected. On November 21, 1991, Social Services moved to terminate Mother's parental rights to J.Y.
Mother's expert witness, Dr. Ted Williams, acknowledged Mother has gaps in her parenting skills, but suggested three alternatives were available instead of terminating Mother's parental rights. First, he suggested both Mother and J.Y. could be placed in foster care with day to day parenting assistance. Second, he suggested both Mother and J.Y. could be placed in a group home. Third, he felt Mother might respond to a coordinated case service plan if it identified specific skills to be developed.
The trial court found that although Mother's intentions are good, she has significant problems controlling her temper *862 and her impulses. The State's expert and Mother's expert agreed J.Y. was not safe in Mother's home without other supervision. Both experts agreed 24-hour-a-day supervision would be necessary. Moreover, the trial court found the 24-hour-a-day supervision would have to continue until J.Y. reaches his teenage years. The trial court found no resource was available in South Dakota to provide that type of supervision.
The trial court found Social Services had provided a "myriad" of services to Mother over the "last few years, including home-based therapy trying to teach the mother the very most basic things about caring for the child, but the mother has difficulty even with these." Although Dr. Williams suggested various alternatives, the trial court found they were neither viable nor in J.Y.'s best interests. The trial court terminated Mother's parental rights after finding Social Services had made reasonable efforts and that no less restrictive alternatives were available.

DECISION

WHETHER "REASONABLE EFFORTS" WERE MADE TO REUNITE MOTHER WITH J.Y.
SDCL 26-8A-21 requires that Social Services "shall make reasonable efforts to make it possible for the child to return to the home of the child's parents, guardian or custodian." The trial court found reasonable efforts had been made. In order to overturn that finding of fact, Mother must show the finding was "clearly erroneous." SDCL 15-6-52(a).
Social Services provided significant, but nevertheless unsuccessful, services to Mother with her prior child. These included: supervised visits; parenting classes; individual case management services; individual therapy for Mother; medical care and advice, home based services including cleaning and child care; and, two case service plans. Parental rights can be terminated upon a showing that the services to the family are unsuccessful or unavailing. People in Interest of S.M.M., 349 N.W.2d 63, 65 (S.D.1984); Matter of M.S.M., 320 N.W.2d 795, 799 (S.D.1982); Matter of R.Z.F., 284 N.W.2d 879, 882 (S.D.1979).
This is not a case where minimal services were offered. The Social Service workers testified that all these services had garnered little, if any, improvement in Mother's ability to be an effective parent for J.Y. A child should not be required to wait for parents to acquire parenting skills that may never develop. See In Interest of A.D., 416 N.W.2d 264, 268 (S.D.1987). The trial court was not clearly erroneous in concluding Social Services had made reasonable efforts.

WHETHER TERMINATION OF PARENTAL RIGHTS WAS THE LEAST RESTRICTIVE ALTERNATIVE AVAILABLE.
Parental rights may be terminated if it is in the best interests of the child. SDCL 26-8-36. People in Interest of S.L.H. 342 N.W.2d 672 (S.D.1983). The standard of review is "whether the trial court's ultimate findingthat clear and convincing evidence indicated termination was the least restrictive alternative commensurate with the child's best interests was clearly erroneous." People in Interest of K.C., 414 N.W.2d 616, 620 (S.D.1987); Matter of A.H., 421 N.W.2d 71 (S.D.1988). This Court's review is not whether it would have made the same finding but whether it is left with a definite and firm conviction that a mistake has been made. People in Interest of T.H., 396 N.W.2d 145, 148 (S.D. 1986).
All the Social Service workers and the expert witnesses (including Mother's expert) testified that Mother does not have the necessary skills to raise J.Y. She was provided the services and the time to develop those skills three years ago with her first child and again before and after the birth of J.Y. The State's witnesses and Mother's expert witness testified that Mother still had not acquired the necessary parenting skills. In fact, Mother's expert witness agreed it would be ill-advised to give Mother unsupervised custody of J.Y.
*863 Mother's expert suggested only three alternatives to termination of parental rights. The first two alternatives involved 24-hour-a-day supervision of Mother and J.Y. The trial court found these were not viable alternatives because such supervision was not available. The third alternative would merely have involved trying that which had already proved unavailing. The trial court decided termination should not be delayed while Mother tried, yet again, to develop the necessary skills to be a parent. In light of the extensive and unsuccessful efforts already made, the trial court concluded termination was the least restrictive alternative in the best interest of J.Y. We affirm the trial court.
WUEST, SABERS and AMUNDSON, JJ., concur.
HENDERSON, Justice, dissents.
HENDERSON, Justice (dissenting).
Notably, this case is captioned: "In the Matter of the Abuse and Neglect of J.Y." by the appellant; State captions its brief "In the Matter of J.Y., Abused and Neglected Child." There was absolutely no testimony or evidence of any abuse and neglect of this child by the mother; hence, this child improperly was denominated an abused and neglected child and the mother's rights were unlawfully terminated. Parents have a fundamental right to the custody of their offspring. It has been termed to be the "fundamental nature of parental rights." Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Via Santosky, the sovereign must absolutely establish that there is clear and convincing evidence that a child is dependent and neglected. See also In re S.L., 419 N.W.2d 689, 692 (S.D.1988).

CHRONOLOGY
 Mother births child on October 6, 1991.
 State of South Dakota, through DSS, by ex parte order, seizes child from mother on October 7, 1991, a day after child is born.
 On October 8, 1991 custody order obtained by State of South Dakota vesting it with custody, pending any further hearings.
 Child, by this seizure, unable to suckle the mother. In my opinion, this amounts to cruel and inhumane treatment. If it was not cruel and inhumane treatment, such conduct is repugnant to the authorities and facts further set forth below.
 State obtains second custody order on November 7, 1991 granting further custody to State; said order specifically directs Social Services to make reasonable efforts to return the child to the child's home.
 State, two weeks after the November 7, 1991 order directing it to make efforts to help mother, files a Notice of Intent to Terminate Parental Rights.
 Continuing in this lightning like scenario, adjudicatory hearing was held on January 22, 1992; trial court orally finds child to be abused or neglected; mother objects and dispositional hearing is scheduled in 60 days.
 Mother continues to try to obtain custody of her infant child and objects to Findings of Fact and Conclusions of Law which terminates her parental rights on June 25, 1992.
 When child was petitioned in as being abused or neglected, the child had never been in the custody of the mother except for its immediate entry from the womb. If the child was "abused" or "neglected," the conclusion is obvious: Child had to be abused or neglected by the agents of South Dakota! She never had custody of the child!
There were never, absolutely never, any reasonable efforts to make a return of this child a possibility for the mother and the child.
Termination of parental rights have to be supported by clear and convincing evidence; further, that termination must be the least restrictive alternative available considering the child's best interests. People in Interest of K.C., 414 N.W.2d 616, 620 (S.D.1987). It is noted by this writer that the DSS "monitored," in its own vernacular, the progress of the expectant *864 mother. The child was born full term and there were no medical complications during the pregnancy. Once the child came into this world, the State seized the newborn infant without any notice to this mother. State could apparently monitor the pregnancy but, as the time schedule reflects above, State did not make reasonable efforts to return the child to the mother and to the child's home. It did not want to monitor mother and child. From the day that the child was born, until the Department of Social Services filed a Notice of Intent to Terminate Parental Rights, roughly 46 days had passed. An affirmative obligation to provide remedial services by the DSS exists under SDCL 26-8A-21; State did not, and could not, provide realistic help and resources in 46 days when the mother never had the babynot even for 1 of those 46 days!
There is no question that the 25 year old female had borderline intelligence. This does not establish that the child is "dependent" or "neglected." It is further noted that the mother took it upon herself, during her pregnancy, to seek assistance from the Department of Social Services, on her own accord. When she sought this help, the Department of Social Services let her know, and the testimony so reflects, that the State's agents could not give her "hands on experience" because "the baby was not born yetyou know, we're not able to actually teach her on the basis, burping; you know, feeding because there wasn't a baby there to do that ..." Social Worker Rebecca Glasford, Transcript, pg. 82. It appears to me that the 14 day interlude between the circuit court judge explicitly requiring the DSS to make reasonable efforts and, on the 14th day, filing a Notice of Intent to Terminate Parental Rights, cries out more loudly than any other fact in this case because it unquestionably reflects that this mother never was given a real chance to nurture her child. In other words, the State had its mind made up. This does not satisfy the requirements outlined by the decision of the United States Supreme Court. The trial court took judicial notice of a previous termination. This does not carry the legal day because this is a new child, born at a different time, and with a mother who was never given a chance to nurture her child. The issues in this case are not the same as the issues in a previous case and thus an implied recognition of the doctrine of res judicata is inappropriate. The issues must be identical for res judicata to apply. Raschke v. DeGraff, 81 S.D. 291, 134 N.W.2d 294 (1965). The Department of Social Services, from the inception of this case, took the position that the mother was going to have another child, and could not care for the child because rights were terminated concerning another child mother had birthed. Said another way, she never was given a chance. I do not believe that this exemplifies the law of this state, as handed down by our previous decisions. Nor does it meet the dictates of the United States Supreme Court. Our State Legislature has expressed the will of the people by SDCL 26-8A-21 that "the Department of Social Services ... shall make reasonable efforts to make it possible for the child to return to the home of the child's parents, guardian or custodian." You can rub it or scrub it anyway you want to, but the conclusion is the same: It wasn't done! There was no "clear and convincing evidence" reflecting that termination was the least restrictive alternative commensurate with the child's best interests. Thus, the decision on entering Findings of Fact and Conclusions of Law terminating this mother's parental rights was clearly erroneous. Matter of A.H., 421 N.W.2d 71 (S.D.1988).
Have we become so calloused that we will permit a state agent to obtain an ex parte court order to seize a little infant out of a hospital and never permit the mother to hold a child or let it suckle? This governmental action is the epitome of the cradle to grave philosophy. Hereby, the DSS has boundless authority to create, by its administrative power, a total separation of mother and baby in South Dakota, via social experimentation, and without due process. This mother never had the child for one day! She was never given an opportunity to parent her infant. Dr. Ted Williams testified below and set forth three options *865 to the termination of parental rights that he opined should be considered: (1) a foster care placement where both mother and child would be parented in a single foster home; thereby, he reasoned that she could be taught daily parenting skills with a "hands on" philosophy, namely that she would have the little baby to take care of and thereby her needs and the child's needs could be monitored (2) a group home where the mother could live with the child, having interplay with other mothers and children experiencing similar experiences; under such option, there would be professionals attendant operating the group home facility (3) rather than to be inundated with various individuals and agencies giving her various suggestions and professional advice, that a single plan be developed enabling mother to know parental skills and to be permitted to exercise these skills without several conflicting viewpoints on how to handle her life. None of these options were explored or adopted. The curtain of the open mind was closed. Mother's and child's destiny were sealed at the instant the child emerged from the womb.
It is noted that there were witnesses, who testified below, although recognizing her intellectual and psychological problems, believed that there was some limited improvement by the mother in the very brief time after the child was born. So there was hope. And there was a reasonable alternative to the termination of the parental rights. There existed less restrictive alternatives. In re B.E., 287 N.W.2d 91 (S.D.1979).
In my opening paragraph, I reminded the reader of the fundamental rights that parents have to the custody of their offspring. In Skinner v. State of Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), Mr. Justice Douglas addressed what he believed was "... a sensitive and important area of human rights." At issue was a sterilization act in Oklahoma pertaining to habitual criminals. Basically, Justice Douglas, in delivering the opinion of the United States Supreme Court, focused on the right to have offspring, which he held was necessary to the perpetuation of the human race. Therein he expressed:
We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race. The power to sterilize, if exercised, may have subtle, far-reaching and devastating effects.
Skinner, 316 U.S. at 541, 62 S.Ct. at 1113.
In effect, is this what the State of South Dakota can do to this mother: Prevent her from having more children as punishment for prior acts or conduct? Is not this an invidious discrimination and oppressive treatment? I believe that it is. She should be at least given a chance to raise her child and not have it snatched from her at the moment it is born. In effect, the Department of Social Services is saying: "Lady, you are guilty before we have seen the evidence." We cannot deny her the right to procreate and to bear children, and that is exactly what we are doing if we permit the Department of Social Services to treat her in this fashion. Approving of the conduct of the Department of Social Services in this case has a far reaching and devastating effect on a fundamental liberty, the right to bear children and the right to raise them. Child also has a right and that is a right to know his mother and his family, to have "roots," if you will.
In consciencein LawI cannot join the majority opinion. Accordingly, I dissent.