The PEOPLE of the State of South Dakota, in the Interest of A.R.P., Alleged Abused or Neglected Child, and Concerning D.R.P. and A.P., Jr.

No. 18452.

Supreme Court of South Dakota.

Considered on Briefs on April 27, 1994.

Decided June 29, 1994.

Jeremiah J. Davis of Dakota Plains Legal Services, Pierre, for appellant Parents, D.R.P. and A.P.

Mark W. Barnett, Atty. Gen., Joan P. Baker, Asst. Atty. Gen., Pierre, for appellee, State of South Dakota.

WUEST, Justice.

D.R.P. (Mother) and A.P., Jr. (Father) appeal an order terminating their parental rights in A.R.P. We affirm.

### FACTS

The record in this case details the history of a family severely affected by mental illness and alcoholism. The briefs offer a combined forty-one pages of facts which we attempt to summarize here from our review of the voluminous record.

Mother was born in 1960 in Eagle Butte, South Dakota, one of twelve children. She is a member of the Cheyenne River Sioux

Tribe. She attended school for twelve years and attended some college classes in a nursing program offered by Presentation College on the Cheyenne River Reservation. Mother has a full-scale IQ of 69, placing her at the low end of the borderline range of intellectual abilities, or the high end of the mild mental retardation range of mental abilities. Mother has given birth to six children, five of whom were born during the period 1980 to 1988. These five children had several different fathers; no father was ever named for one of the children.

In February 1989, the Cheyenne River Sioux Tribal Court terminated Mother's parental rights in all five of the children born in the 1980 to 1988 period. At the dispositional hearing in the present matter, the Honorable Judge James Chasing Hawk of the Cheyenne River Sioux Tribal Court testified as to the history leading up to the termination of Mother's parental rights in her first five children, and the circuit court received as an exhibit the documents, including findings of fact and conclusions of law in that termination proceeding. Judge Chasing Hawk's testimony, as well as the written findings of fact, reveal that Mother's diagnosed schizophrenia, paranoid delusions, hallucinations, dangerous behaviors, abuse and wanton neglect of these children led to the termination of parental rights. The children were frequently found in conditions of squalor, including general filth, animal and human feces. On more than one occasion, the children were found unsupervised and locked in their apartment with the door tied shut. They were hungry, malnourished, underweight, filthy and with rotten teeth. The children were told by Mother not to leave the residence because there was a demon outside the door. Mother slept with a butcher knife because she believed that people were out to get her. She told family members that she had to cut the tails off her children because they looked like little devils. Mother refused to consistently take medication to control her mental illness. Mother was involuntarily committed to the South Dakota Human Services Center in Yankton (HSC) on at least three occasions in 1987 and 1988. She was offered a wide variety of social services and case service plans to assist her to acquire parenting skills,

find housing, utilize day care, locate a job, obtain personal counseling and take medication. No service plans were ever successfully completed. The tribal court concluded that the evidence showed beyond a reasonable doubt that there were no less restrictive means to care for these children than to terminate Mother's parental rights.

Shortly following the termination of Mother's parental rights by the tribal court, she was voluntarily committed to HSC in February 1989. Approximately one month later, she was released to a transitional living facility in Pierre. A Capitol Area Counseling Service (CACS) worker became her mandatory protective payee and supervised the spending of Mother's SSI money and monitored Mother's medications for schizophrenia. Eventually, Mother moved into a subsidized rent apartment in October 1989. Mother continued working with the CACS, and the record shows that she functioned at a marginal level and was minimally cooperative until she became involved in a relationship with Father sometime in 1990.

Father was born in 1961 in Rosebud, South Dakota, one of five children. He is a member of the Rosebud Sioux Tribe. Father completed twelve years of education and spent some time in the Army. He has a full scale IQ of 80, placing him in the borderline range of intellectual abilities. He has been hospitalized at the HSC at least four times—1981, 1983, 1985 and 1990—and has been admitted to numerous other psychiatric and alcohol treatment programs around the country. Father has a long history of ethanol, alcohol, and other substance abuse. Like Mother, Father has been diagnosed with chronic paranoid schizophrenia. He has a history of auditory and visual hallucinations, and has reported hearing voices telling him to hang himself or to have sex with young females. He has reported a belief that someone is trying to kill him. At the time of his November 1990 hospitalization at HSC, Father reported that he was regularly drinking a twelve pack of beer, plus a pint of whiskey or bottle of wine each day. He has taken his medications inconsistently; and although the substance abuse exacerbates his schizophrenia, he has never remained substance-free

for any significant period of time. Father has had numerous jail incarcerations for burglary, public intoxication and domestic violence. His parental rights to a child from a previous relationship were terminated in 1987.

Father moved into Mother's apartment sometime in 1990. The record shows that Mother had Father arrested for assaulting her on at least two occasions. The Department of Social Services (DSS) learned that Mother was pregnant with Father's child in September 1990. Mother was contacted and offered prenatal services, which she refused. Mother was hospitalized four times at St. Mary's Hospital in Pierre during her pregnancy, principally due to her inability or refusal to care for herself and her unborn child during the pregnancy. At the time of her fourth hospitalization at St. Mary's her schizophrenic behaviors had become markedly worse, since she was unable to take her medication during her pregnancy. While on the obstetrics ward, Mother told visitors to watch out for vampires, and to watch out for the nurses because nurses do strange things to babies. Mother was discharged to HSC. Although eight months pregnant at the time of her admission to HSC in February 1991, Mother denied being pregnant. She said that there was poison in her food, and people were trying to brainwash her. In view of her psychotic symptoms and refusal to care for herself, it was decided to medicate Mother in spite of her pregnancy. Mother improved, and when her psychotic symptoms were under control, she was released in March 1991 to the transitional living center in Pierre. Mother gave birth to A.R.P. on April 6, 1991.

In view of Mother's and Father's history, it was the position of DSS that A.R.P. was a child in need of protection. Upon A.R.P.'s release from the hospital, DSS removed him and placed him in foster care. DSS reported the removal and made a request for temporary custody under SDCL 26–8–19.1. The court entered an order ratifying the removal and for temporary custody of A.R.P. The parents were provided with an attorney from Dakota Plains Legal Services (DPLS) in June 1991. Both the Rosebud and Cheyenne River tribes were notified of the action. The Cheyenne River tribe intervened in June 1991, and the Rosebud tribe intervened in January 1992. In July 1991, the Cheyenne River Tribe filed a motion to transfer jurisdiction; thus, the adjudicatory hearing scheduled for August 1, 1991 was continued. The record would indicate that jurisdiction stayed in the state court. In November 1991, the DPLS attorney made a motion for pre-trial conference, and the State also made various motions for production of medical records. Discovery took place for some months, and a two-day adjudicatory hearing was held in April 1992. The court's order adjudicating A.R.P. an abused or neglected child was entered October 16, 1992. In September 1992, Mother and Father informed the court that their DPLS lawyer had resigned, and requested that the court appoint a new attorney for them. The court immediately appointed a new DPLS attorney for them. The date of the dispositional hearing was set for November 30, 1992. In the interim, the new DPLS attorney resigned, having never made an appearance on behalf of Mother and Father. Another DPLS attorney (present counsel) was assigned, and the hearing was reset for February 4–5, 1993. On January 11, 1993, counsel for Mother and Father asked for a continuance. On February 3, 1993, counsel for Mother and Father made a motion to reinstate unsupervised visitation. (The parents had been having unsupervised visits of several hours, but a pattern had developed wherein A.R.P. would return to the foster home with diarrhea, which would clear up until he visited Mother and Father again; then the diarrhea returned. Thus, DSS had implemented a supervised visitation plan.) A hearing was held on February 16, then continued until February 25, 1993. The court ordered that unsupervised visitation be reinstated, with "spot checks" by DSS workers. The dispositional hearing was held on May 25–26, 1993. On the first day of that hearing, counsel for Mother and Father made a motion to dismiss the action based on SDCL 26–8A–26, on the grounds that the statute provides that a child cannot remain in foster care for more than eighteen months without a dispositional decree. The court denied the motion, stating that it would not be "in the best interests of

the child to simply forget about the matter." Lengthy testimony ensued from numerous witnesses, all detailing the history of efforts made on the part of DSS and other agencies to work with Mother and Father. At the end of the dispositional hearing, the court stated from the bench that "permanent termination of parental rights ... will be the order of this Court." On June 21, 1993, the court entered its final dispositional order along with findings of fact and conclusions of law, terminating parental rights of Mother and Father.

Mother and Father appeal, raising three issues. Additional facts are noted where necessary.

## I. DID THE TRIAL COURT ERR IN DENYING PARENTS' MOTION TO DISMISS PURSUANT TO SDCL 26–8A–26?

SDCL 26–8A–26 provides in pertinent part:

> If an adjudicated abused or neglected child whose parental rights have not been terminated has been in the custody of the department of social services without a court approved plan for long-term foster care and it appears at a dispositional or review hearing (1) that all reasonable efforts have been made to rehabilitate the family, (2) that the conditions which led to the removal of the child still exist and (3) there is little likelihood that those conditions will be remedied so the child can be returned to the custody of the child's parents, the court shall affirmatively find that good cause exists for termination of the parental rights of the child's parents and the court shall enter an order terminating parental rights. ... *In no case may a child remain in foster care for a period in excess of eighteen months without the court making a dispositional decree setting forth one of the above options.*

*Id.* (emphasis added). As stated, at the beginning of the dispositional hearing on May 25, 1993, Mother and Father made a motion to dismiss the case because A.R.P. had been in foster care for twenty-five months without a final disposition. The court denied this motion, and we affirm this determination.

It is true that A.R.P.'s time in foster care exceeded eighteen months. In large part, however, the delay was due to the parents' difficulty in obtaining and maintaining an attorney. The first two DPLS lawyers appointed for Mother and Father resigned prior to the final disposition of this matter. Had the court mandated that the hearing be held at the eighteen-month mark, Mother and Father would have been forced to appear without counsel. When present counsel was appointed, a continuance was requested and granted to allow counsel time to prepare. Had the lower court refused to grant these continuances, we would expect complaints that such denials would have been an abuse of discretion by the court.

■ We note that SDCL 26–8A–1 provides that the purpose of the statutory scheme is "to establish an effective state and local system for protection of children from abuse or neglect." *Id.* We have stated that in termination proceedings, "[T]he prime concern of the court is the child. The best interests of the child must prevail." *In re H.A.H.*, 502 N.W.2d 120, 124 (S.D.1993) (citing *In re S., V & L.W.*, 398 N.W.2d 136, 139 (S.D.1986); *State ex rel. K.C.*, 414 N.W.2d 616, 620 (S.D.1987)). We agree with the lower court that dismissal of this case would not be in the best interests of the child.

The purpose of time limits such as those found in SDCL 26–8A–26 is "to prevent children from languishing in the uncertainty of foster care." *State ex rel. D.M.*, 367 N.W.2d 769, 773 (S.D.1985). However, under the facts and circumstances of this case, A.R.P. was not "languishing" in foster care. A.R.P. had been in the same, stable foster home since his birth. The extension of time in reality had the effect of allowing Mother and Father additional opportunities to demonstrate that they could achieve the goals embodied in their DSS case service plan, which they failed to do.

In support of our decision here, we note an Iowa case involving termination of parental rights, wherein the Iowa Court of Appeals reviewed the trial court's refusal to grant the parents' motion to dismiss on the grounds

the lower court had failed to abide by time standards for case processing. *In re C.L.H. and S.D.H.*, 500 N.W.2d 449, 451 (Iowa App. 1993). The court noted that lack of adherence to the time standards occurred in part because of continuances requested by the parents. 500 N.W.2d at 452. Noting that the "primary concern in termination proceedings is the best interests of the child," the court continued: "To dismiss the petition based on the untimeliness of the proceedings would not have been in the best interests of the children. We find the [lower] court did not err in refusing to dismiss the termination of parental rights petition for failure to abide by the time standards for case processing." *Id.* We agree with the reasoning of this court, and affirm the lower court's denial of the motion to dismiss.

## II. DID THE STATE PROVE BEYOND A REASONABLE DOUBT THAT TERMINATION OF BOTH MOTHER'S AND FATHER'S PARENTAL RIGHTS WAS THE LEAST RESTRICTIVE ALTERNATIVE AVAILABLE COMMENSURATE WITH THE BEST INTERESTS OF THE CHILD?

■ To fall within the jurisdiction of the Indian Child Welfare Act (ICWA) "a child must be an unmarried person under the age of eighteen who is either a member of an Indian Tribe or eligible for membership in an Indian Tribe and the biological child of a member of an Indian Tribe." *In re M.C.*, 504 N.W.2d 598, 600 (S.D.1993) (citing *In re A.L.*, 442 N.W.2d 233, 235 (S.D.1989); 25 U.S.C. § 1903(4)). It is undisputed that A.R.P. is an Indian child within the jurisdiction of the ICWA. This court has stated that the provisions of the Indian Child Welfare Act (ICWA) must be complied with in Indian child custody proceedings. *In re K.A.B.E. and K.B.E.*, 325 N.W.2d 840, 842 (S.D.1982). It logically follows that we must also comply with ICWA provisions in proceedings to terminate parental rights. As this court has previously noted, child custody proceedings involving the termination of parental rights to an Indian child are subject to specific minimum federal procedures and standards.

*In re N.S.*, 474 N.W.2d 96, 98 (S.D.1991). The ICWA provides:

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(f). Thus, the burden of proof that must be shown is "evidence beyond a reasonable doubt." *Id.* The ICWA additionally requires the State to show that it made efforts to prevent the breakup of the Indian family. In this regard, the ICWA provides:

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d). Arguments by Mother and Father that such efforts were not made or were only perfunctory are completely without merit. Our review of the record shows that the DSS consistently attempted to provide a broad range of services to these parents. Noting that, "these efforts and their futility must be shown beyond a reasonable doubt," we find that the record is more than ample to meet the requirements of the ICWA. *In re L.N.W.*, 457 N.W.2d 17, 19 (Iowa App.1990) (citing *In re Kreft*, 384 N.W.2d 843, 148 Mich.App. 682 (1986)).

In meeting the evidentiary burden, the trial court properly reviewed the history of Mother and Father and the facts relating to the termination of parental rights as to their other six children. "[E]vidence as to the probability of future adequate care is competent and may serve as a basis for the termination of parental rights.'" *In re J.A.H.*, 502 N.W.2d 120, 126 (S.D.1993) (Sabers, J., concurring in part and dissenting in part) (quoting *In re M.B.*, 288 N.W.2d 773, 775 (S.D. 1980)). "'Due process requires a showing of

a certain threshold of harm to justify termination, but does not mandate that a child be subjected to actual deprivation before such a determination is instituted. A termination proceeding is preventative as well as remedial.' " *Id.* (quoting *In re* B.E., 287 N.W.2d 91, 95 (S.D.1979)).

The court also reviewed the history of the DSS efforts· and the behaviors of Mother and Father during the twenty-five months from the birth of A.R.P. in April 1991 until the time of the dispositional hearing in May 1993. The findings of fact made by the trial court are amply supported by the record. " 'This court does not decide factual issues de novo[.]' " *J.A.H.*, 502 N.W.2d at 123 (quoting *In re* D.H., 354 N.W.2d 185, 188 (S.D.1984)). "We will not disturb the court's findings of fact 'unless they are clearly erroneous and we are, after a review of all the evidence, left with a definite and firm conviction that a mistake has been made.' " *Id.* (quoting *In re* A.M., 292 N.W.2d 103, 105 (S.D.1980); *In re* V.D.D., 278 N.W.2d 194, 197 (S.D.1979)).

The record contains numerous instances of Father's inappropriate behaviors. For example, on January 19, 1991, when Mother was pregnant with A.R.P., Father drank as much as a twelve-pack of beer and some whiskey and struck Mother several times, for which Father was arrested. Following the birth of A.R.P., Father continued to have a history of drinking and failing to stay on his medication for schizophrenia. Father admits that sometimes he just forgets his medication; other times, when he is drinking, he purposely chooses to not take his medication. There was testimony that even when Father is taking his medications for schizophrenia, he still has periods of hallucinations. In January 1992, Father had a "party" at the apartment wherein he admits to drinking a twelve-pack of beer; some of those present at the party were ingesting Lysol, although Father denies that he did so. Father has a history of leaving town for extended periods of time without informing anybody. In both June and October 1992, Father "took off" without notice. He apparently enters one alcohol treatment program, then leaves prior to completion of the treatment and seeks out other treatment, none of which ever appears

to be successfully completed. At the dispositional hearing in May 1993, Father admitted to drinking during the previous month. During one of A.R.P.'s visits to the apartment, A.R.P. found one of Father's medication pills and put it in his mouth; a social worker had to tell Father to take the pill out of A.R.P.'s mouth. During the dispositional hearing, Father left the courtroom one afternoon because he "didn't like" the testimony of one of the DSS workers.

Mother testified at the dispositional hearing that she does not have hallucinations, but that she sees and hears ghosts. These ghosts look like people, and let Mother know of their presence by knocking on the wall or calling her name; then they disappear. Mother acknowledged that she gets angry at the DSS workers when they criticize her, and that is why Mother asks them to leave her apartment. Mother acknowledged that although she and Father were to attend independent living classes as part of the DSS case service agreement, they failed to attend. One reason for not going to these classes, according to Mother, is that she and Father had "started using Tuesday as our day of rest." Apparently, other days are also used as a "day of rest," described by Mother as a day to just "sit back and watch TV or something." Mother did not explain how she and Father would cope with caring for a small child, who likely would not understand the concept of a "day of rest." Mother acknowledged an incident that took place when she was riding a care center bus, and wanted the bus driver to make an unplanned stop. When the bus driver did not stop, Mother simply opened the door of the moving vehicle, forcing the driver to stop. Mother did not think that this was irresponsible action. Mother denies that Father is an alcoholic, and feels that they have a "good" marriage. Although Mother has had a mandatory protective payee, and has shown little skill at money management, she states that she could manage her own money.

Mother and Father were provided with numerous opportunities for visitation with A.R.P. during the twenty-five months prior to the dispositional hearing. Some of these visits were supervised at the DSS offices,

while others were unsupervised at the apartment with DSS "spot checks." The record of attendance was spotty at best. There were many supervised visits for which Mother and Father simply did not appear, and failed to even telephone DSS. For the home visits, the DSS worker and foster parent would bring A.R.P. to the apartment. Mother and Father would often not be there, not answer the door, or would answer the door only after the DSS worker had knocked and waited for twenty minutes. DSS workers reported that the apartment was dirty, there was food on the floor, garbage in easy reach of a small child, and numerous safety hazards. In summary, Mother and Father appear unable to provide for their own most basic needs without the assistance of others, and lack the ability to provide for the needs of a child. The trial court concluded that:

> [DSS] has made all reasonable efforts to address the parenting, safety and home management issues, but no progress has been made by the parents. The same problems exist today that existed 25 months ago. Either the parents are incapable of solving the problems or are resistant to solving the problems.

"Parental rights can be terminated upon a showing that the services to the family are unsuccessful or unavailing.... A child should not be required to wait for parents to acquire parenting skills that may never develop." *In re J.Y.*, 502 N.W.2d 860, 862 (S.D.1993) (citations omitted). We agree with the trial court that in light of the extensive and unsuccessful efforts already made, termination of parental rights was the least restrictive alternative in the best interest of A.R.P. *J.Y.*, 502 N.W.2d at 863.

### III. DID THE TRIAL COURT ERR BY REFUSING TO RECEIVE AN EXHIBIT OFFERED INTO EVIDENCE BY MOTHER AND FATHER?

Approximately two weeks before the dispositional hearing, a DSS worker set up a video recorder on a tripod during an unsupervised visit in the apartment. The DSS worker left, and the recorder ran for the length of the two-hour tape. The parents offered the tape into evidence. The court refused the evidence, stating that the probative value of a tape "showing two hours in the life of the last 25 months" was insufficient to make it competent evidence.

Had the trial court admitted and viewed the entire tape, "we do not believe the court would have reached a different result." *In re S.L.*, 419 N.W.2d 689, 692 (S.D.1988). This court has viewed the videotape in question and finds it to be equivocal at best. At trial, counsel urged that the tape showed the home to be "relatively clean and tidy" as well as depicting Father playing with and interacting with A.R.P. in a positive manner. The tape shows only a single, limited view of one small area of the apartment. The videotape shows garbage within easy reach of A.R.P., and the child is depicted reaching into the waste receptacles. While Father does spend some appropriate playtime with A.R.P., the videotape also shows that Father leaves the room for extended periods of time during the two-hour tape. In view of all the other evidence in this case, the probative value of the videotape is negligible.

Evidentiary rulings of the court are reviewed under an abuse of discretion standard. *Zens v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co.*, 479 N.W.2d 155, 159 (S.D.1991) (citations omitted). *See State v. Christopherson*, 482 N.W.2d 298, 300 (S.D. 1992). "We review evidentiary rulings on the basis of abuse of discretion. 'For us to disturb the evidentiary rulings of the circuit court, we must determine that an abuse of discretion has occurred. Once again, an abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence.'" *State v. Moriarty*, 501 N.W.2d 352, 355 (S.D.1993) (quoting *State v. Devall*, 489 N.W.2d 371, 374 (S.D.1992) (citations omitted)). It was within the discretion of the court to refuse to admit the tape as evidence, and we affirm the court on this issue.

The judgment of the circuit court terminating parental rights is affirmed.

MILLER, C.J. and HENDERSON and SABERS, JJ., concur.

AMUNDSON, J., concurs in the result.

AMUNDSON, Justice (concurring in result).

The record contains a plethora of evidence which shows Mother and Father lack the ability to properly parent A.R.P. DSS set up video equipment to assess Mother and Father's parenting during an unsupervised visit with A.R.P. at their residence. The DSS worker testified that this video showed good points and bad points regarding parenting ability.

The parents offered this video as an exhibit during the dispositional hearing. Neither the State nor counsel for the child objected to its admission. The trial court rejected the offer of the video for the following reasons:

> [T]he ruling to disallow [the video] in evidence is because if we're going to start showing two hours in the life of the last 25 months, then the better evidence would be six hours or eight hours or, of course, with technology 25 months, and, of course, by the time we watched that then we'd have another 25 months out of the way and it's too much chance for acting and it's an inefficient way to present evidence and I don't find that its probative value is sufficient to make it competent evidence.

> Counsel for Appellants: Can I bring it as an offer of proof?

> The Court: Well, I'm not going to play it and watch it and then determine whether to let it in or not.

The State then withdrew its consent to the exhibit's admission and jumped on the court's bandwagon.

These parents are confronted with termination of their parental rights. This is a very serious decision which will affect them for the remainder of their lives. In an effort to terminate these parents' rights, DSS presented evidence which covered Mother and Father's entire life, starting from birth. The picture portrayed by the State regarding Mother and Father's parenting ability is bleak to say the least. On the other hand, parents should not be denied the opportunity to present whatever positive evidence they possess when defending against termination of their parental rights.

As pointed out by the majority, "the probative value of the video tape is negligible." That may be an accurate statement, but it certainly reflects that there is some probative value. Therefore, the exhibit should have been received into evidence. This is another case where the weight of the offered evidence is negligible but no justification existed for not admitting it. *State v. Likness,* 386 N.W.2d 42 (S.D.1986). Although the trial court erred in excluding this piece of evidence, this exclusion does not amount to prejudicial error. As previously stated, the State had such an abundance of evidence to justify the termination of parental rights that this modicum of good points would not have produced a different result. *Larson v. Locken,* 262 N.W.2d 752 (S.D.1978).