*In re* ROE

Docket No. 283642. Submitted August 6, 2008, at Lansing. Decided September 25, 2008, at 9:00 a.m.

The Department of Human Services petitioned the Chippewa Circuit Court, Family Division, for the termination of the parental rights of Theresa Finfrock to Ashtyn J. Roe. Both the respondent and her daughter are members of the Sault Ste. Marie Tribe of Chippewa Indians, which intervened as a respondent. The court, Lowell R. Ulrich, J., terminated Finfrock's parental rights because one of her children died under suspicious circumstances and her parental rights to another child had been terminated on the basis of serious and chronic neglect or physical abuse, and prior attempts to rehabilitate Finfrock have been unsuccessful, MCL 712A.19b(3)(*i*). The court further found beyond a reasonable doubt that continued custody by Finfrock would have likely resulted in serious emotional or physical damage to the child, § 1912(f) of the Indian Child Welfare Act (ICWA), 25 USC 1912(f). Finfrock appealed.

The Court of Appeals *held*:

1. Section 1912(f) provides that no termination of parental rights to an Indian child may be ordered in the absence of a determination, supported by evidence beyond a reasonable doubt, that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. Additionally, § 1912(d), 25 USC 1912(d), provides that any party seeking to effect the termination of parental rights to an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that the efforts proved unsuccessful.

2. The proper standard of proof for determinations under § 1912(d) with respect to active efforts concerning remedial services and rehabilitative programs is proof by clear and convincing evidence.

3. Formal or informal services provided before the current proceeding may meet the "active efforts" requirement of § 1912(d). The ICWA does not require current active efforts if it is clear that past efforts have met with no success. Where there is

clear and convincing evidence that the provision of additional services would be futile, that finding can meet the requirements of § 1912(d). The "active efforts" requirement imposes a requirement on the Department of Human Services to take an involved, rather than a passive, approach when providing remedial services and rehabilitative programs to an Indian family. Finally, the ICWA requires the provider of remedial services or rehabilitative programs to provide culturally relevant services or programs to prevent the breakup of the family.

4. In this case, the trial court failed to make the factual findings required by § 1912(d) in the manner described by the Court of Appeals. The trial court's decision must be reversed and the case must be remanded for further proceedings.

Reversed and remanded for further proceedings.

GLEICHER, J., concurring in part and dissenting in part, agreed with the majority that the "clear and convincing evidence" standard governs whether active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that the efforts proved unsuccessful. She also agreed that the circuit court in this case failed to make the required finding that the department made active efforts that proved unsuccessful. However, Judge GLEICHER disagreed with the majority's determination that previous rehabilitative efforts, involving other children and entirely different circumstances, may meet the requirements of § 1912(d). She further disagreed with the conclusion that the circuit court may altogether avoid applying § 1912(d) by deciding that additional services would be futile. The ICWA's "beyond a reasonable doubt" standard of proof for termination of parental rights to an Indian child precludes a presumption of unfitness predicated solely on past conduct. Rather, the court must engage in a meaningful examination of present circumstances to determine whether the continued custody of the child by the parent is likely to result in emotional or physical damage to the child. In the absence of evidence of current active efforts in this case, the trial court's decision must be reversed.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — INDIANS.

No termination of parental rights to an American-Indian child may be ordered unless a court determines beyond a reasonable doubt that continued custody of the child by an Indian parent is likely to result in serious emotional or physical damage to the child and determines by clear and convincing evidence that active efforts have been made to provide remedial services and rehabilitative

programs designed to prevent the breakup of the Indian family and that the efforts proved unsuccessful (25 USC 1912[d], [f]).

2. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — INDIANS — REMEDIAL SERVICES AND REHABILITATIVE PROGRAMS — ACTIVE EFFORTS TO PREVENT BREAKUP OF INDIAN FAMILIES.

   Active efforts at culturally relevant remedial services and rehabilitative programs designed to prevent the breakup of an Indian family, which efforts are required before parental rights to an Indian child may be terminated, may be shown by evidence that past efforts have met with no success or by evidence that the provision of future services and programs would be futile (25 USC 1912[d]).

*Brian A. Peppler*, Prosecuting Attorney, and *Marsha Teysen*, Assistant Prosecuting Attorney, for the Department of Human Services.

Michigan Indian Legal Services (by *Cameron Ann Fraser*) for Theresa Finfrock.

*James A. Bias* for the Sault Ste. Marie Tribe of Chippewa Indians.

Before: MARKEY, P.J., and WHITBECK and GLEICHER, JJ.

WHITBECK, J. In this case involving the termination of parental right to an Indian child, respondent Theresa Finfrock appeals as of right the trial court order terminating her parental rights to her daughter Ashtyn Jasmin Roe. The trial court terminated Finfrock's rights after finding that her rights to another child had been terminated because of physical abuse and that prior attempts to rehabilitate her had been unsuccessful.[1] As the Indian Child Welfare Act (the ICWA) requires,[2] the trial court further found that continued custody by Finfrock was likely to result in serious

---

[1] MCL 712A.19b(3)(i).

[2] 25 USC 1901 *et seq.*

emotional or physical damage to the child.[3] On appeal, Finfrock argues that the trial court erred by failing to require petitioner Department of Human Services (the Department) to prove that it made "active efforts" to provide the remedial services and rehabilitative programs that the ICWA required.[4] Finfrock further argues that the trial court clearly erred when it found that Finfrock's continued custody was likely to result in serious emotional or physical damage to the child. We conclude that the ICWA requires the trial court to make findings regarding whether the Department made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and regarding whether those efforts proved unsuccessful. Because the trial court did not make these findings, we vacate its order terminating Finfrock's parental rights and remand the case for further proceedings consistent with this opinion.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Ashtyn Roe was born to Finfrock and Samuel Roe in October 2007. Ashtyn Roe was Finfrock's third child. Finfrock's first child, Daniel Finfrock, was born in April 1997. Finfrock's second child, Aliyah Bertrand, was born in August 2000.

Daniel Finfrock had several developmental handicaps and required considerable care. In January 2005, he died from intracranial trauma. Finfrock and her then-boyfriend, Steven Perrault, were Daniel Finfrock's only caregivers on the day that he sustained his injuries. Daniel Finfrock's death was later ruled a homicide.

---

[3] See 25 USC 1912(f).

[4] See 25 USC 1912(d).

After Daniel Finfrock's death, the Department sought the termination of Finfrock's parental rights to Aliyah Bertrand. And in July 2005, a tribal court terminated Finfrock's rights to Aliyah Bertrand after Finfrock failed to comply with her service plan.

Shortly after Ashtyn Roe's birth, the Department petitioned the Chippewa Circuit Court, Family Division, to terminate Finfrock's parental rights to this child. In the petition, the Department alleged that Daniel Finfrock died from intracranial trauma that was later ruled a homicide. It further alleged that Finfrock and Perrault told tribal police and the FBI that they were the only caregivers for Daniel Finfrock on the day he was injured. The petition noted that the criminal investigation into Daniel Finfrock's death remained unresolved. The petition also alleged that Finfrock's parental rights to Aliyah Bertrand had been terminated in July 2005 and that Finfrock had failed to comply with the service plan put in place for her at that time. Finally, the petition alleged that Samuel Roe was convicted of attempted fourth-degree criminal sexual conduct with a 14-year-old in 1996 and that he and Finfrock still resided together. On the basis of these allegations, the Department asked the trial court to terminate Finfrock's parental rights to Ashtyn Roe under MCL 712A.19b(3)(i). At a December 2007 hearing, Finfrock admitted these allegations and agreed to the trial court's jurisdiction.

The trial court held a termination trial in January 2008. At the trial, Robyn Hill, who was the foster care worker assigned to Finfrock's case in 2005, testified that the tribal court had terminated Finfrock's parental rights to her older daughter, Aliyah Bertrand. Hill also testified about her work with Finfrock. Hill noted that Finfrock had a history of choosing relationships with

men that had histories of domestic violence. Hill expressed concern about Finfrock's new relationship with a man who had a criminal sexual conduct conviction.

David Babcock testified that he was a protective services worker for the Department. He stated that he was concerned about Finfrock's new relationship and by her recent conviction for furnishing alcohol to a minor. Babcock indicated that Daniel Finfrock's death was a serious concern because Finfrock may have had a direct role in his death or, at the very least, contributed to it through her relationship with a man that she knew was abusive. Babcock opined that Finfrock's newest relationship was another poor choice and reflected a continuing pattern of behavior that placed her children at risk. Babcock testified that Finfrock minimized the risks posed by her relationships. Babcock also expressed concern that, although she was able to reiterate the things that were taught to her in her parenting and substance abuse classes, Finfrock did not seem to be able to incorporate those concepts into her day-to-day living.

Lori Tomkinson, the foster worker assigned to this case, testified that Finfrock stated that she did not really know why her parental rights to her older daughter were terminated, but later admitted that she did not comply with the plan's requirement that she leave Perrault. Tomkinson stated that Finfrock also admitted that she left her handicapped son with a man who was abusive towards her.

Martha Snyder testified as an expert on Indian child law. She stated that Finfrock's conduct was definitely not within the parental norms of the tribal community. She testified that Finfrock appeared to put her own needs first and that she doubted that Finfrock could ever place her children's needs ahead of her own.

Snyder opined that, if returned to her mother, Ashtyn Roe would be in danger of serious emotional, physical, and mental harm. She also indicated that she believed that the Department had met the reasonable requirements to keep the family intact, given Finfrock's knowledge of or involvement in Daniel Finfrock's death.

In addition to this testimony, there was testimony that established that Finfrock had obtained some mental health services and had successfully participated in a drug court program. Indeed, Finfrock's therapist testified that Finfrock had been discharged from therapy and that she had begun to realize that she did not need another person to make her whole. Further, Finfrock's mother testified that Finfrock had changed her lifestyle and that she was not making the same choices that she used to make. She also stated that she knew Samuel Roe and that he did not exhibit the controlling and violent behavior that Perrault did. Finally, Finfrock herself testified about the changes she had made for herself. Finfrock stated that she had worked on the issues that had plagued her in the past and that she would now live her life in a good way.

In February 2008, the trial court issued its opinion from the bench. The trial court found that the provisions of MCL 712A.19b(3)(i) had been proved beyond a reasonable doubt, stating, "There had been a case service plan. There had been a death of one child, neglect of the other, and efforts to rehabilitate the [mother] were unsuccessful, resulting in termination . . . so that part of the statute has been complied with beyond a reasonable doubt." The trial court then turned to the ICWA's requirements. After summarizing the record evidence, the trial court concluded that "the evidence establishes beyond a reasonable doubt . . . that the custody of this child by the respondent mother is

likely to result in serious emotional or physical damage to the child." For this reason, the trial court terminated Finfrock's parental rights to Ashtyn Roe. Finfrock now appeals as of right.

## II. THE ICWA

### A. STANDARD OF REVIEW

Finfrock argues that the trial court erred when it terminated her parental rights to Ashtyn Roe without requiring the Department to prove beyond a reasonable doubt that it made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of her Indian family and that these efforts proved unsuccessful.[5] More specifically, Finfrock alleges three specific errors in this regard. First, she contends that the trial court failed to make specific findings regarding whether active efforts were made and had proven unsuccessful before it proceeded with the termination. Second, she argues that the efforts the Department provided as part of a prior termination case will not satisfy the requirements of § 1912(d) of the ICWA. Rather, she argues, the Department must provide new efforts for each case, which the Department did not do in this case. Third, she argues that the evidence the Department presented at trial was insufficient to prove beyond a reasonable doubt that the efforts the Department actually provided were unsuccessful. Each of these errors, Finfrock contends, warrants reversal of the trial court's decision to terminate her parental rights.

This Court reviews for clear error a trial court's decision terminating parental rights.[6] "A circuit court's

---

[5] See 25 USC 1912(d).

[6] MCR 3.977(J); *In re Trejo Minors*, 462 Mich 341, 356-357; 612 NW2d 407 (2000).

decision to terminate parental rights is clearly erroneous if, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made."[7] However, this Court reviews de novo questions of law, such as the proper interpretation of the ICWA.[8]

### B. THE ICWA REQUIREMENTS

Congress enacted the ICWA in response to evidence of abusive child welfare practices in the states that resulted in the separation of large numbers of Indian children from their families and tribes.[9] The ICWA does not entirely displace the application of state child custody laws to proceedings involving Indian children. But it does impose certain mandatory procedural and substantive safeguards.[10] Thus, although due process normally only requires that a state prove a ground for termination by clear and convincing evidence,[11] under the ICWA, "[n]o termination of parental rights may be ordered . . . in the absence of a determination, supported by evidence beyond a reasonable doubt . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[12] Additionally, under the ICWA:

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under

[7] *In re JK*, 468 Mich 202, 209-210; 661 NW2d 216 (2003).

[8] *In re Fried*, 266 Mich App 535, 538; 702 NW2d 192 (2005).

[9] 25 USC 1901; *Mississippi Band of Choctaw Indians v Holyfield*, 490 US 30, 32; 109 S Ct 1597; 104 L Ed 2d 29 (1989).

[10] *Mississippi Band of Choctaw Indians, supra* at 36; *In re Elliott*, 218 Mich App 196, 201; 554 NW2d 32 (1996).

[11] *Santosky v Kramer*, 455 US 745, 747-748; 102 S Ct 1388; 71 L Ed 2d 599 (1982).

[12] 25 USC 1912(f).

State law shall satisfy the court that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.[13]

It is undisputed that the provisions of the ICWA apply to this case involving an Indian parent and her child.[14]

C. THE TRIAL COURT'S FACTUAL FINDINGS ON ACTIVE EFFORTS

As stated, under the plain language of § 1912(d) of the ICWA, the Department had the burden of proving that "active efforts have been made" to prevent the breakup of Finfrock's family and "that these efforts have proved unsuccessful." Further, because the Department must "satisfy" the trial court that the active efforts were made and were unsuccessful in order "to effect" the termination, the trial court had to find specifically that the Department had made active efforts and that these efforts were unsuccessful before it could proceed with the termination of Finfrock's parental rights.[15]

Contrary to the contentions of the Department, the child's guardian ad litem, and the Sault Ste. Marie

---

[13] 25 USC 1912(d) (emphasis added).

[14] See 25 USC 1903.

[15] *In re SD*, 236 Mich App 240, 244-245; 599 NW2d 772 (1999) (noting that active efforts are normally required before termination of parental rights, but concluding that § 1912[d] did not apply to the facts of the case because termination would not break up an Indian family). See also *In re Walter W*, 274 Neb 859, 862-863; 744 NW2d 55 (2008) (noting that, in addition to the state elements required to terminate parental rights, the ICWA imposes two additional elements: the active efforts element and the serious emotional or physical damage element); *In re JS*, 177 P3d 590, 591 (Okla Civ App, 2008) (noting that the active efforts requirement is a predicate finding that the trial court must make before a termination case may proceed).

Tribe of Chippewa Indians (the Tribe), the trial court did not make the findings required under § 1912(d) of the ICWA. The Department and the Tribe correctly note that the trial court mentioned that there "had been a case service plan" and that "efforts to rehabilitate the [mother] were unsuccessful." But the trial court did not make these statements as part of findings concerning the requirements of § 1912(d) of the ICWA. Rather, the trial court made these remarks in the context of its finding that the Department had proved the statutory grounds for termination under MCL 712A.19b(3)(i). Indeed, there is nothing in the trial court's opinion that even suggests that it was aware that it had to make findings under § 1912(d) of the ICWA. Manifestly, therefore, the trial court failed to make the requisite findings under § 1912(d) of the ICWA.

Because the trial court did not make the requisite findings under § 1912(d) of the ICWA, it lacked the authority to proceed with the termination of Finfrock's parental rights.[16] Therefore, we reverse the trial court's decision to terminate Finfrock's parental rights to Ashtyn Roe and remand this case to the trial court for the necessary factual findings under § 1912(d) of the ICWA.

Given our resolution of this issue, we decline to address Finfrock's contention that the trial court clearly erred when it found that her continued custody of Ashtyn Roe would likely result in serious emotional or physical damage. On remand, the trial court will again have the opportunity to consider the facts and make a finding concerning the likelihood of serious emotional or physical damage.[17] However, because the

---

[16] *In re SD, supra* at 244.

[17] See 25 USC 1912(f).

parties disagree about the nature of the findings required by § 1912(d) of the ICWA and the proper burden of proof, and because those disagreements are likely to reoccur on remand, we address the parties' remaining arguments on the proper application of § 1912(d) of the ICWA.

### D. THE APPLICABLE STANDARD OF PROOF

The parties disagree about the standard of proof applicable to the trial court's findings under § 1912(d) of the ICWA. Finfrock contends that the requirements of § 1912(d) must be proven beyond a reasonable doubt. In contrast, the Tribe and the child's guardian ad litem contend that the Department's burden under § 1912(d) need only be proven by clear and convincing evidence and that this Court's previous applications of a beyond a reasonable doubt standard were incorrect.[18]

We note that this Court, in *In re Morgan*, simply adopted the beyond a reasonable doubt standard applied by the South Dakota Supreme Court in *In re SR* without actually analyzing whether that was the proper standard.[19] In that case, the South Dakota Supreme Court noted that Congress did not specify a standard of proof for determinations made under § 1912(d) of the ICWA.[20] Nevertheless, without engaging in any analysis, the court stated that it "assume[d] that the same burden required to prove serious emotional or physical harm under § 1912(f), beyond a reasonable doubt, would also be required to prove active efforts by the

---

[18] See *In re Kreft*, 148 Mich App 682, 693; 384 NW2d 843 (1986); *In re Morgan*, 140 Mich App 594, 604; 364 NW2d 754 (1985).

[19] *In re Morgan, supra* at 604, citing *In re SR*, 323 NW2d 885 (SD, 1982).

[20] *In re SR, supra* at 887.

party seeking termination."[21] Other states, however, have rejected application of that standard.[22] For example, in *In re Walter W*, the Nebraska Supreme Court rejected application of a beyond a reasonable doubt standard to determinations under § 1912(d), explaining:

> Congress did not intend in 25 USC § 1912 to create a wholesale substitution of state juvenile proceedings for Indian children. Instead, in § 1912, Congress created additional elements that must be satisfied for some actions but did not require a uniform standard of proof for the separate elements. As discussed, Congress imposed a "beyond a reasonable doubt" standard for the "serious emotional [or] physical damage" element in parental rights termination cases under § 1912(f). Congress also imposed a "clear and convincing" standard of proof for the "serious emotional or physical damage" element in foster care placements under § 1912(e). The specified standards of proof in subsections § 1912(e) and (f) illustrate that if Congress had intended to impose a heightened standard of proof for the active efforts element in § 1912(d), it would have done so.[23]

Because Congress did not provide a heightened standard of proof for § 1912(d) of the ICWA, the Nebraska Supreme Court declined to read the beyond a reasonable doubt standard into the statute.[24] Instead, the court determined that the default standard of proof for all termination of parental rights cases applied.[25]

---

[21] *Id.*

[22] See *In re Walter W, supra* at 864 n 9, 864-865 (listing jurisdictions that have rejected the beyond a reasonable doubt standard for determinations made under § 1912[d] and joining that group). See also *In re Michael G*, 63 Cal App 4th 700, 709-712; 74 Cal Rptr 2d 642 (1998) (rejecting the line of authorities that impose a heightened burden of proof on determinations under § 1912[d]).

[23] *In re Walter W, supra* at 864-865.

[24] *Id.* at 865.

[25] *Id.*

We agree with the Nebraska Supreme Court's analysis: Congress clearly demonstrated its ability to impose a particular standard of proof for the elements required under the ICWA. But Congress chose *not* to do so for the § 1912(d) "active efforts" determinations. Therefore, we conclude that this Court in *In re Morgan* and in *In re Kreft* incorrectly adopted a beyond a reasonable doubt standard of proof for these determinations. This Court issued both of these decisions before November 1, 1990, and there are no published decisions after that date applying the beyond a reasonable doubt standard to determinations under § 1912(d) of the ICWA. Therefore, we are not bound by precedent to apply this standard of proof.[26] We hold that the proper standard of proof for determinations under § 1912(d) of the ICWA is the default standard applicable to all Michigan cases involving the termination of parental rights. That standard is proof by clear and convincing evidence.[27]

### E. THE "ACTIVE" EFFORTS REQUIREMENT

The parties also disagree about whether the active efforts must be part of a service plan offered in connection with *current* proceedings. We conclude that formal or informal services provided *before* the current proceeding may meet the "active efforts" requirement of § 1912(d) of the ICWA. Further, we conclude that, where there is clear and convincing evidence that the provision of additional services would be futile, that finding can meet the requirements of § 1912(d).

Subsection 1912(d) of the ICWA clearly places the burden on the party seeking termination to satisfy the trial court that active efforts to provide the required

---

[26] MCR 7.215(J)(1).

[27] See *In re Trejo Minors, supra* at 356-357.

services have been made and that they were unsuccessful. But the statute does not provide guidance concerning the nature or extent of the active efforts necessary to satisfy the requirement or the timing within which those efforts must be made.[28] The statute merely requires proof that "active efforts have been made to provide remedial services or rehabilitative programs" to prevent the breakup of the Indian family at some point before termination and that the efforts "proved unsuccessful."[29] Hence, there is no precise formula for determining what constitutes sufficient "active efforts."

Our colleague in her thoughtful dissent concludes that the term "active efforts" "embodies a temporal component" and should be interpreted as requiring current, or contemporaneous, rehabilitation efforts.[30] We respectfully disagree. We acknowledge that the term "active" may be "characterized by current activity, participation, or use."[31] However, because a Michigan court has not yet interpreted the term "active efforts," we may look to other jurisdictions for guidance.[32] In keeping with the majority of jurisdictions that have previously addressed this issue, we hold that the Department need not show temporally concurrent "active" efforts with each proceeding under the ICWA.

Most notably, in *In re KD*, the Colorado Court of Appeals explicitly concluded that the " 'active efforts' required by § 1912(d) of the ICWA need not be part of a

---

[28] See *In re Walter W, supra* at 865 (noting that the language "sets out praiseworthy but vague goals for the courts to enforce," which fail to give guidance "in determining whether the Department's efforts were sufficient to meet ICWA's mandates").

[29] 25 USC 1912(d).

[30] *Post* at 122.

[31] *Random House Webster's College Dictionary* (1997) (citing as examples, "active member" and "active account").

[32] *People v Rogers*, 438 Mich 602, 609; 475 NW2d 717 (1991).

treatment plan offered as part of the current dependency proceedings."[33] Accordingly, the court held that, because of the extensive, but unsuccessful, services that the social services department provided to the father during two previous dependency cases, it would be an " 'exercise in futility' " to offer another treatment plan.[34]

Several other jurisdictions have also held that, although § 1912(d) of the ICWA requires "active efforts," it does not require a social services department to " 'persist with futile efforts.' "[35] For example, in *EA v Div of Family & Youth Services*, the Alaska Supreme Court held that where parental rights have already been terminated with respect to one or more children, the court "may consider the degree of the state's efforts to prevent the breakup of the entire family in assessing whether that effort was sufficient under ICWA."[36] The court noted that the Division of Family and Youth Services (DFYS) had "expended substantial efforts over the last decade to prevent the breakup of [the] family, without success."[37] The court further stated that, therefore, "[t]here [was] no reason to think that either an

---

[33] *In re KD*, 155 P3d 634, 637 (Colo App, 2007).

[34] *Id.* (stating that "the court may terminate parental rights without offering additional services when a social services department has expended substantial, but unsuccessful, efforts over several years to prevent the breakup of the family, and there is no reason to believe additional treatment would prevent the termination of parental rights").

[35] *Id.*, quoting *In re JSB*, 691 NW2d 611, 621 (SD, 2005), and citing *In re PB*, 371 NW2d 366, 372 (SD, 1985) (stating that a social services department is not charged with "the duty of persisting in efforts that can only be destined for failure"). See also *In re Nicole B*, 175 Md App 450, 472; 927 A2d 1194 (2007) ("[T]he requirement of 'active efforts' does not require 'futile efforts.' ").

[36] *EA v Div of Family & Youth Services*, 46 P3d 986, 991 (Alas, 2002).

[37] *Id.*

additional psychological evaluation or an additional seven months of intervention would have prevented" the termination.[38]

Similarly, in *Letitia V v Superior Court of Orange Co*, the California Court of Appeals addressed "whether 'active efforts' within the meaning of ICWA require reunification services be provided for each individual child or, put another way, whether the state is free to consider what it defines as recent but unsuccessful reunification efforts with the same parent but a different child sufficient to satisfy the mandate of [25 USC 1912(d)] with regard to a sibling."[39] Stating that "[t]he law does not require the performance of idle acts," and noting the drain on resources that the provision of further services would put on an already strained dependency system, the court held that additional services were not necessary where the service provider had already spent years providing unsuccessful services that did not benefit the parent.[40]

---

[38] *Id.*, citing *NA v Div of Family & Youth Services*, 19 P3d 597, 603-604 (Alas, 2001) (stating that there is no reason to think that the DFYS's failure to enroll the parent in yet another residential dual-treatment program would have resulted in a more successful outcome), and *KN v Alaska*, 856 P2d 468, 477 (Alas, 1993) (noting that "[a]lthough ... DFYS might have done more, it is unlikely that further efforts by DFYS would have been effective in light of [the parent's] attitude").

[39] *Letitia V v Superior Court of Orange Co*, 81 Cal App 4th 1009, 1016; 97 Cal Rptr 2d 303 (2000).

[40] *Id.*, citing *AA v Div of Family & Youth Services*, 982 P2d 256, 262 (Alas, 1999) (additional services not required where parent demonstrates "lack of commitment to treatment"); *AM v Alaska*, 945 P2d 296, 305 (Alas, 1997) (in determining sufficiency of remedial efforts, court may consider a parent's demonstrated lack of willingness to participate in treatment); *In re Annette P*, 589 A2d 924, 928-929 (Me, 1991) (finding prior remedial efforts sufficient where parents failed to cooperate with case worker or demonstrate interest in reunification); *In re ARP*, 519 NW2d 56, 60-62 (SD, 1994) (finding that the efforts made in siblings' cases were sufficient to justify the termination of parental rights without the provision of additional remedial services); *In re SR, supra* at 887

In keeping with these jurisdictions, we conclude that the ICWA does not require *current* active efforts " 'if it is clear that past efforts have met with no success.' "[41] Thus, where a parent has consistently demonstrated an inability to benefit from the Department's provision of remedial and rehabilitative services, or has otherwise clearly indicated that he or she will not cooperate with the provision of the services,[42] a trial court's finding that additional attempts to provide services would be futile will satisfy the requirements of § 1912(d) of the ICWA. Nothing in § 1912(d) precludes the Department from seeking termination of parental rights where active efforts to reunite the family have proven unsuccessful in the past.[43] " 'A child should not be required to wait for parents to acquire parenting skills that may never develop.' "[44]

Thus, we conclude that nothing within § 1912(d) of the ICWA requires the Department to provide duplica-

---

(finding active efforts within the meaning of the ICWA after repeated but unsuccessful steps were taken to encourage the mother to take advantage of available treatment programs); *CEH v LMW*, 837 SW2d 947, 957 (Mo App, 1992) (additional remedial programs not required where prior "efforts became futile and proved unsuccessful"); *State ex rel Juvenile Dep't of Multnomah Co v Woodruff*, 108 Or App 352, 357; 816 P2d 623 (1991) (additional services not required by ICWA where parents with long history of alcohol and drug abuse had received prior services).

[41] *In re KD*, *supra* at 637, quoting *In re Adoption of Hannah S*, 142 Cal App 4th 988, 998; 48 Cal Rptr 3d 605 (2006).

[42] See *Wilson W v Office of Children's Services*, 185 P3d 94, 101-103 (Alas, 2008) (holding that the Office of Children's Services was not required to keep trying to provide services to a violent and uncooperative parent once it became clear that the attempts would be futile).

[43] See *In re Romano*, unpublished opinion per curiam of the Court of Appeals, issued December 11, 1998 (Docket No. 207482). Although nonbinding, we find this statement from this unpublished opinion persuasive. MCR 7.215(C)(1); *Dyball v Lennox*, 260 Mich App 698, 705 n 1; 680 NW2d 522 (2003).

[44] *In re ARP*, *supra* at 62 (quotation marks and citation omitted).

tive remedial or rehabilitative services.[45] Subsection 1912(d) does not specify the time within which the active efforts must have been made. Rather, it only requires that the trial court be satisfied that the Department, in fact, made such active efforts before the trial court may proceed. Construed in context, § 1912(d) only requires "that timely and affirmative steps be taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families whenever possible by providing services designed to remedy the problems which might lead to severance of the parent-child relationship."[46] For these reasons, the fact that the Department provided particular services in connection with a *prior* proceeding does not necessarily preclude such services from meeting the "active efforts" requirement in a *current* proceeding. Rather, the Department "may engage in 'active efforts' by providing formal or informal efforts to remedy a parent's deficiencies before dependency proceedings begin."[47] Whether the prior services were timely and sufficient will depend on the facts specific to the case.[48]

Accordingly, we decline to employ a definition of "active" that stresses a temporal requirement. In the context of the ICWA, we read the term "active" as being "marked by or disposed to direct involvement or practical action."[49] In other words, we read the "active efforts" requirement as imposing an obligation on the Department to take an involved, rather than a passive, approach when providing remedial services and reha-

---

[45] See *Letitia V, supra* at 1016.

[46] *Id.*

[47] *In re KD, supra* at 637.

[48] *Wilson W, supra* at 101; *In re Walter W, supra* at 865.

[49] *Random House Webster's College Dictionary*, p 13 (citing as example, "active support").

bilitative programs to an Indian family. We note that in *AA v Div of Family & Youth Services* the Alaska Supreme Court specifically adopted this active versus passive interpretation, stating:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts, the intent of the drafters of the Act, is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.[50]

Similarly, in *In re JS*, the Oklahoma Court of Civil Appeals explained as follows:

> Used in § 1912(d) as an adjective modifying "effort," the common and ordinary meaning of "active" means "characterized by action rather than contemplation or speculation" or "participating," *Webster Third New International Dictionary* 22 (1986), and "causing action or change," "effective," or "active efforts for improvement," *The American Heritage Dictionary* 7 (1986). As the Alaska Supreme Court in *A.A. v. State of Alaska* recognized, the opposite or antonym of "active" is "passive." *See The New Webster Encyclopedic Dictionary of the English Language* (1980).[51]

Stated another way, "active efforts" requires more than simply pointing the parent in the right direction, it "requires 'leading the horse to water.' "[52]

---

[50] *AA, supra* at 261 (quotation marks and citation omitted). See also *In re AN*, 325 Mont 379, 384; 106 P3d 556 (2005) ("The term active efforts, by definition, implies heightened responsibility compared to passive efforts. Giving the parent a treatment plan and waiting for him to complete it would constitute passive efforts.").

[51] *In re JS, supra* at 593.

[52] *Id.* at 594.

We further note that the majority of jurisdictions interpret "active efforts" as imposing a higher burden than various states' "reasonable efforts" requirement,[53] and that numerous courts have required that the service provider "provide *culturally relevant* remedial and rehabilitative services to prevent the breakup of the family."[54]

In sum, on remand, the trial court must determine whether there was clear and convincing evidence that the Department met its burden under § 1912(d) of the ICWA. In doing so, the trial court should consider the adequacy of the past provisions of remedial services to Finfrock, taking into account the extent of the Department's efforts and their cultural relevance. The trial court may also consider evidence that the provision of additional services to Finfrock would be futile.

III. CONCLUSION

Because the trial court failed to make the factual findings required by 25 USC 1912(d), it could not

---

[53] *In re Nicole B, supra* at 471 ("The majority of courts that have considered the 'active efforts' requirement . . . have determined that it sets a higher standard for social services departments than the 'reasonable efforts' required by state statutes."). See also *Winston J v Dep't of Health & Social Services*, 134 P3d 343, 347 n 18 (Alas, 2006); *MW v Dep't of Health & Social Services*, 20 P3d 1141, 1146 n 18 (Alas, 2001); *In re Walter W, supra* at 865; *In re JS, supra* at 593.

[54] *Carson P ex rel Foreman v Heineman*, 240 FRD 456, 474, 500 (D Neb, 2006) (emphasis added). See also *In re Walter W, supra* at 865 ("[A]t least some efforts should be 'culturally relevant.' "); *In re Michael G, supra* at 714 (stating that "the court should take into account "the prevailing social and cultural conditions and way of life of the Indian child's tribe," and that remedial services should "involve and use the available resources of the extended family, the tribe, Indian social service agencies and individual Indian care givers") (quotation marks and citation omitted); *In re Welfare of Children of SW*, 727 NW2d 144, 150 (Minn App, 2007) (stating that "active efforts" are "thorough, careful, and culturally appropriate efforts") (quotation marks and citation omitted).

proceed to terminate Finfrock's parental rights to Ash-
tyn Roe. Consequently, we reverse the trial court's
decision, vacate the termination order of February 1,
2008, and remand for further proceedings consistent
with this opinion.

Reversed and remanded for further proceedings con-
sistent with this opinion. We do not retain jurisdiction.

MARKEY, P.J., concurred.

GLEICHER, J. (*concurring in part and dissenting in
part*). I concur with the majority's conclusion that the
clear and convincing evidence standard governs
whether "active efforts have been made to provide
remedial services and rehabilitative programs designed
to prevent the breakup of the Indian family and that
these efforts have proved unsuccessful." 25 USC
1912(d). I also agree that the circuit court failed to
make the required finding that petitioner made "active
efforts" that proved unsuccessful. I respectfully dis-
agree, however, with the majority's determination that
previous rehabilitative efforts, involving other children
and entirely different circumstances, may meet the
requirements of §1912(d) of the Indian Child Welfare
Act (ICWA), 25 USC 1901 through 1963. Further, I
disagree with the majority's conclusion that the circuit
court may altogether avoid applying § 1912(d) by sim-
ply deciding that additional services would be "futile."

I. FACTUAL BACKGROUND

Respondent's first child, Daniel Finfrock, died on
January 8, 2005. The medical examiner concluded that
Daniel had sustained intracranial trauma, and ruled his
death a homicide. When Daniel's injury occurred, re-
spondent and Steven Perrault, her then-boyfriend, were

Daniel's sole caregivers. Neither the United States nor the state of Michigan filed criminal charges against Perrault or respondent.[1] Respondent continued to cohabit with Perrault after Daniel's death, despite her belief that Perrault had harmed the child. Respondent later acknowledged her awareness that Perrault's presence created a risk of harm for Aliyah, respondent's two-year-old daughter. On January 10, 2005, petitioner filed a petition seeking circuit court jurisdiction over Aliyah. The tribal court of the Sault Ste. Marie Tribe of Chippewa Indians eventually assumed jurisdiction of the proceedings.[2]

Respondent received services coordinated by the Binogii Placement Agency, which supplies adoption and foster care services to the Sault Ste. Marie Chippewa Tribe. According to Robyn Hill, a Binogii foster care worker, respondent reported that Perrault had abused her emotionally, physically, and sexually, and had confessed to having "hurt Daniel." Respondent also described domestic violence committed by her estranged husband, Jose Bertrand. Hill referred respondent for domestic violence counseling and parenting classes. Hill reported that respondent participated in the recommended services, but failed to terminate her relationship with Perrault. In April 2005, the tribe filed a petition in the tribal court seeking the termination of respondent's parental rights to Aliyah, and all services ceased. Only then did respondent move into a domestic violence shelter. She never reestablished her relationship with Perrault.

---

[1] Because Perrault and respondent lived on reservation land, the Federal Bureau of Investigation investigated Daniel's death.

[2] According to MCR 3.980(A)(3), "[i]f the tribe exercises its right to appear in the proceeding and requests that the proceeding be transferred to tribal court, the court shall transfer the case to the tribal court unless either parent objects to the transfer ... or the court finds good cause not to transfer."

In June 2005, respondent independently sought counseling through the Sault Tribe's behavioral health program, and also commenced employment with a local casino. In July 2005, the tribe terminated respondent's parental rights to Aliyah. Respondent continued counseling with William Lane Barber, a mental health therapist employed by the Tribe, until July 28, 2006. In September 2006, after being charged with furnishing alcohol to a minor, respondent entered a drug court diversion program, which she successfully completed.

In December 2006, respondent began an intimate relationship with Samuel Roe, a casino coworker, and conceived Ashtyn in February 2007. Respondent lost her job at the casino because of pregnancy-related complications. She delivered Ashtyn on October 26, 2007. That same day, petitioner filed a petition in the circuit court seeking circuit court jurisdiction over the infant. An amended petition filed two weeks later described Daniel's death and the previous termination of respondent's parental rights to Aliyah. The petition alleged that Roe "was convicted of attempted 4th degree criminal sexual conduct with a 14 yr old in 1996. He remains a registered sex offender." According to the petition, respondent and Roe had purchased a house, and Roe "told petitioner that he intends to remain with" respondent.

On December 14, 2007, respondent admitted the allegations made in an amended petition, and the circuit court assumed jurisdiction over Ashtyn. The amended petition sought termination of respondent's parental rights to Ashtyn pursuant to MCL 712A.19b(3)(i), which permits a court to terminate parental rights if it finds by clear and convincing evidence that "[p]arental rights to 1 or more siblings of the child have been terminated due to serious and

chronic neglect or physical or sexual abuse, and prior attempts to rehabilitate the parents have been unsuccessful."

After respondent entered her plea, the court heard testimony regarding visitation and "reasonable efforts" to reunite the family. Martha Snyder, a "qualified Indian expert," recommended that the court permit Roe supervised visitation, and that petitioner offer him a service plan. But Snyder opposed allowing respondent any visitation, and admitted that no efforts had been made "to maintain the child in the home." Snyder conceded that the ICWA required "reasonable efforts," although she expressed, "I don't know what would be reasonable efforts in this case."[3] The circuit court opined:

> Alright, then the Court's satisfied, under MCR 3.978(C) that, based upon the evidence here, that I'm satisfied by clear and convincing evidence, including the testimony of Ms. Snyder, that services have been provided in the past and that they failed to be successful as admitted to here in the petition today. And so the Court's satisfied that services were provided to prevent the break-up and removal of the child, and so the Court's going to continue the child out of home under jurisdiction of the Court.

The circuit court commenced a termination hearing on January 15, 2008. As recounted by the majority, Hill, Snyder, David Babcock, and Lori Tomkinson testified in support of terminating respondent's rights to Ashtyn.

Hill explained that she became Aliyah's foster care worker in January 2005, while respondent and Aliyah were under tribal court jurisdiction. Hill described the services offered to respondent during those four months in 2005 as follows: "I did make referrals for domestic

---

[3] As discussed in more detail, later, the ICWA actually requires "active efforts," not "reasonable efforts."

violence through the . . . Sault Tribe [sic]. She was offered parenting." Hill provided the court with no further description of the services offered to respondent, and admitted that she had no contact with respondent after April 2005. According to Hill, respondent "did participate" in the services, but Hill did not further elaborate. Hill identified as her current "biggest concern" "that this child would experience and witness some of the same things that have happened to the other two children historically." Hill conceded that she knew "nothing" about the "actual home life" of respondent and Roe, lacked any knowledge regarding Roe besides the fact that he had a previous conviction, knew of no reason that Roe would harm Ashtyn, and could only speculate "as to what may or may not happen in the future" based on respondent's past relationships with Perrault and Bertrand.

Snyder opined that respondent's relationship history did not meet the tribe's "parenting norms." When questioned regarding "reasonable efforts to keep this family intact," Snyder testified, "I think there have been many prior reasonable efforts with [respondent], and given this circumstance of her still being only one of two people that could have killed Danny, I mean, at the very best, she has to know, so with [respondent], I'm definite, you know on termination." Snyder did not additionally detail any of the "prior reasonable efforts" given respondent.

Babcock, a Department of Human Services (DHS) worker, admitted that he had never personally worked with respondent. Babcock nonetheless believed that respondent's parental rights to Ashtyn should be terminated because she had a recent conviction of furnishing alcohol to a minor, had become involved with Roe, a convicted sex offender, and failed to promptly extricate

herself from her relationship with Perrault, despite her awareness that he was violent and abusive toward her and her children. Babcock lacked awareness of any counseling that respondent received after the termination involving Aliyah. Despite Roe's prior conviction of attempted criminal sexual conduct, Babcock approved that petitioner intended to offer Roe services, and Babcock "specifically did not request termination" of Roe's parental rights.

Tomkinson, another DHS worker, testified that she interviewed respondent and Roe. Tomkinson recalled that respondent referred to Roe as her fiancé and identified the relationship as "a dream relationship." Respondent told Tomkinson that she "wanted to get back in Tribal Social Services for counseling" with Roe. Tomkinson recommended termination of respondent's rights on the basis of "[t]he prior termination of parental rights in the tribal court, the unresolved homicide of Daniel, and the risk of harm to Ashtyn if placed with her mother." Tomkinson further recommended that the circuit court order Roe to separate from respondent.

Barber, respondent's mental health therapist, testified that during their initial sessions, respondent demonstrated "a lot of shame and guilt, a lot of blame. She blamed herself for getting involved in relationships that were harmful. She blamed herself for being involved with Mr. Perrault." When Barber discharged her from therapy in 2006, respondent "was living by herself. She was holding a job. She was making her own money, not being dependent on someone else to pay bills for her, to make decisions for her." Barber characterized respondent's prognosis as "excellent."

Patrick McKelvie, a caseworker for the tribe's community and family services agency, testified that respondent entered the drug court program sometime in

September 2006, when he served as the coordinator of that program. According to McKelvie, respondent "was a model participant," who "did everything that was expected of her. She completed her GED [general equivalency diploma] in record time. She never tested dirty. She kept all of her appointments. She never tried to renegotiate the terms of the program."

Respondent and her mother testified that respondent continued to have supervised visits with Aliyah, even though her parental rights to the child were terminated.

In its bench opinion, the circuit court reviewed the evidence and concluded that petitioner had proven the statutory ground contained in MCL 712A.19b(3)(i) "beyond a reasonable doubt." The circuit court reasoned, "There had been a case service plan. There had been a death of one child, neglect of the other, and efforts to rehabilitate the [respondent] were unsuccessful, resulting in termination . . . so that part of the statute has been complied with beyond a reasonable doubt." As required by the ICWA,[4] the circuit court made a separate finding, that "the evidence establishes beyond a reasonable doubt . . . that the custody of this child by respondent mother is likely to result in serious emotional or physical damage to the child."

### II. THE ICWA'S "ACTIVE EFFORTS" REQUIREMENT

The majority acknowledges that "under the plain language of [25 USC 1912(d)], the Department had the

---

[4] Pursuant to 25 USC 1912(f):

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

burden of proving that 'active efforts have been made' to prevent the breakup of [respondent's] family and 'that these efforts have proved unsuccessful.' " *Ante* at 97. The majority qualifies this indisputably accurate statement with the observation that "formal or informal services provided *before* the current proceeding may meet the 'active efforts' requirement of § 1912(d) . . . ." (Emphasis in original). *Ante* at 101. The majority further opines that "where there is clear and convincing evidence that the provision of additional services would be futile, that finding can meet the requirements of § 1912(d)." *Ante* at 101.

I respectfully disagree with both qualifications. In my view, previously provided services likely cannot satisfy the "active efforts" requirement, and a court may not presume, solely on the basis of prior services, that current services "would be futile."

### A. THE MEANING OF "ACTIVE EFFORTS"

In *Mississippi Band of Choctaw Indians v Holyfield*, 490 US 30, 32; 109 S Ct 1597; 104 L Ed 2d 29 (1989), the United States Supreme Court explained that the ICWA

> was the product of rising concerns in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.

The Supreme Court further observed that Congressional findings "incorporated into the ICWA" included:

> "(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . . ;

"(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

"(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." [*Id.* at 35-36, quoting 25 USC 1901.]

The ICWA contains "[v]arious . . . provisions" that "set procedural and substantive standards" for state court child custody proceedings involving Indian children. *Mississippi Band of Choctaw Indians, supra* at 36. The ICWA's "active efforts" standard provides:

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. [25 USC 1912(d).]

In contrast to the ICWA's mandate that a party seeking termination of parental rights satisfy the court that "active efforts" have been made to provide remedial services and rehabilitative programs, Michigan law permits a petitioner to withhold services if a parent "has had rights to the child's siblings involuntarily terminated." MCL 712A.19a(2)(c). Here, petitioner refused to offer any services to respondent because it filed a petition invoking only MCL 712A.19b(3)(i) as a ground for termination of respondent's parental rights. Subsection i contemplates as follows: "Parental rights

to 1 or more siblings of the child have been terminated
due to serious and chronic neglect or physical or sexual
abuse, and *prior attempts to rehabilitate the parents
have been unsuccessful.*" (Emphasis supplied.)

### B. RESOLUTION OF ANY CONFLICT BETWEEN THE ICWA AND MICHIGAN LAW

In *Mississippi Band of Choctaw Indians*, the United
States Supreme Court examined the meaning of the
word "domicile," used in the ICWA's § 1911(a), 25 USC
1911(a), to establish jurisdiction for tribal courts. The
Supreme Court considered whether Congress intended
the definition of "domicile" to be determined under
state or federal law. *Id.* at 43. Invoking congressional
purpose, the *Mississippi Band of Choctaw Indians*
majority emphasized that "Congress intended a uni-
form federal law of domicile for the ICWA." *Id.* at 47.
The Supreme Court imbued "content" into the term
"start[ing] with the assumption that the legislative
purpose is expressed by the ordinary meaning of the
words used," considering the " 'object and policy' " of
the statute. *Id.*

*Mississippi Band of Choctaw Indians* requires that in
this case we interpret the phrase "active efforts" using
the ordinary meaning of the words, considering the
"object and policy" of the ICWA. The ICWA embodies
Congress's intent "to protect the best interests of
Indian children and to promote the stability and secu-
rity of Indian tribes and families . . . ." 25 USC 1902. In
*People ex rel JSB, Jr*, 691 NW2d 611, 616 (SD, 2005),
the South Dakota Supreme Court examined in detail
the "object and policy" of the ICWA's "active efforts"
provision and the interplay between the "active efforts"
provision of the ICWA and a state law permitting
termination of parental rights when "reasonable ef-

forts" at reunification had failed. *Id.* at 618. In South Dakota, as well as in Michigan, a court may terminate parental rights without providing any services if the involved parent subjected the child to aggravated circumstances, including abandonment or sexual abuse, or has had his rights to other children terminated on the grounds of abuse or neglect. *Id.* The South Dakota Supreme Court held that the state law provision excusing a petitioner from making "reasonable efforts" to unify a family did not override the ICWA's obligation that "active efforts" be made to reunite JSB with his father. *Id.* The South Dakota Supreme Court also rejected that Congress's enactment of the Adoption and Safe Families Act (ASFA), 42 USC 671, which contemplates suspension of a state's duty to undertake "reasonable efforts" toward reunification in certain aggravated circumstances,[5] diminished the state's burden to

---

[5] The relevant portion of the ASFA provides as follows:

(a) Requisite features of State plan.

In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—

\* \* \*

(15) provides that—

(A) in determining reasonable efforts to be made with respect to a child, as described in this paragraph, and in making such reasonable efforts, the child's health and safety shall be the paramount concern;

(B) except as provided in subparagraph (D), reasonable efforts shall be made to preserve and reunify families—

(i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and

supply "active efforts" in all cases governed by the

(ii) to make it possible for a child to safely return to the child's home;

(C) if continuation of reasonable efforts of the type described in subparagraph (B) is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan (including, if appropriate, through an interstate placement), and to complete whatever steps are necessary to finalize the permanent placement of the child;

(D) reasonable efforts of the type described in subparagraph (B) shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that—

(i) the parent has subjected the child to aggravated circumstances (as defined in State law, which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse);

(ii) the parent has—

(I) committed murder (which would have been an offense under section 1111(a) of Title 18, if the offense had occurred in the special maritime or territorial jurisdiction of the United States) of another child of the parent;

(II) committed voluntary manslaughter (which would have been an offense under section 1112(a) of Title 18, if the offense had occurred in the special maritime or territorial jurisdiction of the United States) of another child of the parent;

(III) aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter; or

(IV) committed a felony assault that results in serious bodily injury to the child or another child of the parent; or

(iii) the parental rights of the parent to a sibling have been terminated involuntarily;

(E) if reasonable efforts of the type described in subparagraph (B) are not made with respect to a child as a result of a determination made by a court of competent jurisdiction in accordance with subparagraph (D)—

ICWA. *Id.* at 619-620. The reasoning in *JSB* has been adopted by a number of other state courts.[6]

Here, the record evidence reveals that when petitioner filed the initial permanent custody petition, it entirely refused to provide respondent with services intended to preserve her familial relationship with Ashtyn, or to improve her ability to function as a parent. In my view, Congress's use of the term "active efforts" signals its intent that petitioner clearly and convincingly demonstrate the provision of *current* rehabilitative efforts designed to reunite an Indian parent with the particular child that is the target of the termination proceedings. Past efforts, involving other children and completely different circumstances, do not satisfy the object and policy of the ICWA, and do not qualify as "active efforts."

The term "active" is defined as "characterized by action rather than contemplation or speculation," or

---

(i) a permanency hearing . . . , which considers in-State and out-of-State permanent placement options for the child, shall be held for the child within 30 days after the determination; and

(ii) reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan, and to complete whatever steps are necessary to finalize the permanent placement of the child; and

(F) reasonable efforts to place a child for adoption or with a legal guardian, including identifying appropriate in-State and out-of-State placements may be made concurrently with reasonable efforts of the type described in subparagraph (B) . . . . [42 USC 671.]

[6] *In re Welfare of Children of SW*, 727 NW2d 144, 150 (Minn App, 2007); *Winston J v Dep't of Health & Social Services, Office of Children's Services*, 134 P3d 343, 347 n 18 (Alas, 2006); *In re Interest of Dakota L*, 14 Neb App 559, 573-575; 712 NW2d 583 (2006); *In re AN*, 325 Mont 379, 384-385; 106 P3d 556 (2005).

"marked by present operation, transaction, movement or use." *Merriam-Webster Online Dictionary*, "active" <http://www.merriam-webster.com/dictionary/active> (accessed August 12, 2008). In *Frasier v Model Coverall Service, Inc*, 182 Mich App 741, 744; 453 NW2d 301 (1990), this Court examined the statutory phrase "active employment," and concluded:

> Placing the "active" before employment must have been for the purpose of adding some further meaning— distinguishing between employees who were actually engaged in performing work for an employer at the time of retirement and those who were not. It follows, therefore, that "active employment" means one who is actively on the job and performing the customary work of his job, as opposed to one who terminates inactive employment.[7]

The phrase "active efforts" inherently embodies a temporal component, particularly in the context of the ICWA's motivating principles. The meaning of "active efforts" becomes clear by reference to the "object and policy" of the ICWA, which requires that a state prove *beyond a reasonable doubt* that "the *continued* custody" of the Indian child by the parent "*is* likely to result in serious emotional or physical damage to the child." 25 USC 1912(f) (emphasis supplied).[8] Standing alone, evidence of a parent's response to efforts provided years before, under altogether different conditions and with respect to other children, does not supply proof beyond a reasonable doubt regarding an Indian parent's cur-

---

[7] According to Black's Law Dictionary (8th ed), p 228, an "active case" is "[a] case that is still pending." In *Wayne Co v Wayne Co Retirement Comm*, 267 Mich App 230, 250-251; 704 NW2d 117 (2005), this Court interpreted "active employees . . . of the County" to mean present or current county employees.

[8] Our Supreme Court relied heavily on the tense used when it interpreted MCL 600.2912a(2) in *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 60-61; 631 NW2d 686 (2001).

rent ability to safely manage "the continued custody" of a child. Indeed, this Court has recognized that "[s]ince a parent's fitness is not a static concept, much can happen in six months to reflect on that fitness." *In re LaFlure*, 48 Mich App 377, 391; 210 NW2d 482 (1973).[9]

The majority cites several cases from other jurisdictions in support of its conclusion that a finding that further active efforts would be "futile" may satisfy the ICWA's requirement. However, those cases are readily distinguishable from the instant case. For example, in *Letitia V v Superior Court of Orange Co*, 81 Cal App 4th 1009, 1016; 97 Cal Rptr 2d 303 (2000), the mother had a long history of substance abuse, and the child "entered the world—and the juvenile dependency system —under the influence of cocaine." *Id.* at 1011. The court's description of the unsuccessful services provided to the mother over the course of six years before the child's birth consumes almost four pages of the opinion. Despite the mother's dreadful record of noncompliance, the petitioner attempted to provide her with more services after the birth of the child, including a referral to a drug recovery program. *Id.* at 1014-1015. In contrast to this case, the mother in *Letitia V* actually received some current services, but clearly demonstrated that she lacked any genuine interest in reforming her drug habit.

Similarly, the Indian father in *People ex rel KD*, 155 P3d 634, 636 (Colo App, 2007), received years of services during two previous dependency proceedings directed toward rehabilitating his relationship with the child. When the third dependency proceeding com-

---

[9] Notably, in *LaFlure*, this Court remanded for a new hearing de novo regarding the respondent's fitness, and ordered that her "fitness to have custody of Gary is to be determined *as of the date the circuit court considers this case on remand*." *Id.* at 392 (emphasis supplied).

menced involving the same child, the petitioner asserted that the father "suffered from an emotional illness" and, therefore, "no appropriate treatment plan could be devised." *Id.* The Colorado Court of Appeals held that "the court may terminate parental rights without offering additional services when a social services department has expended substantial, but unsuccessful, efforts over several years to prevent the breakup of the family, and there is no reason to believe that additional treatment would prevent the termination of parental rights." *Id.* at 637. In a subsequent ICWA case discussing *People ex rel KD*, the Colorado Court of Appeals explained that because of the father's emotional illness, "no treatment plan could address his parental unfitness." *In re NB*, 199 P3d 16, 24; 2007 WL 2493906, *9 (Colo App, 2007). Nevertheless, in marked contrast to the instant case, the father in *KD* received services for years, including treatment provided shortly before the child's final removal from the home.

Here, petitioner produced absolutely no evidence that respondent received "active efforts . . . to prevent the breakup of [her] Indian family." Snyder, the qualified Indian expert, admitted that no efforts had been made to maintain Ashtyn in respondent's home. Hill conceded that because she lacked any knowledge of respondent's current home situation, she could only speculate regarding respondent's fitness to parent Ashtyn. When petitioner removed Ashtyn from respondent and Roe, it unquestionably split apart their Indian family. It did so without providing *active* efforts to *that* family, as required by the ICWA. The ICWA's stated policy that Indian families be preserved whenever possible reinforces my conclusion that clear and convincing proof of "active efforts" requires more than a passing reference to a brief period of services provided three

years earlier, under vastly different circumstances. Further, without familiarizing itself with respondent's current situation, petitioner could not begin to determine whether services would potentially benefit respondent.

The majority decides that

> where a parent has consistently demonstrated an inability to benefit from the Department's provision of remedial and rehabilitative services, or has otherwise clearly indicated that he or she will not cooperate with the provision of the services, a trial court's finding that additional attempts to provide services would be futile will satisfy the requirements of § 1912(d) of the ICWA. Nothing in § 1912(d) precludes the Department from seeking termination of parental rights where active efforts to reunite the family have proven unsuccessful in the past. [*Ante* at 105.]

I cannot reconcile this dictum with the majority's definition of "active efforts," or the purposes of the ICWA. Here, "the family" subject to reunification bears virtually no relation to "the family" involved in respondent's prior termination. Previous active efforts to reunite respondent with Aliyah unlikely implicated the parenting issues relevant today, given that Perreault is out of the picture and no record evidence exists that Roe currently qualifies as physically or emotionally abusive. Further, the prior termination occurred pursuant to tribal law, and the tribe rather than the Department provided services. Because the Department never provided "remedial and rehabilitative services," respondent cannot possibly have "consistently demonstrated an inability to benefit" from them.

Additionally, the record evidence does not reflect whether respondent ever received "active efforts" consistent with "leading her to water," rather than passive efforts such as the "offers" and "referrals" described by Hill. The record also is silent regarding whether the

previous services had "cultural relevance." On remand, an in-depth analysis of these questions will not serve to answer beyond a reasonable doubt the only significant question now facing the circuit court: will continued custody of Ashtyn by respondent likely result in serious emotional or physical injury to Ashtyn? Without a meaningful examination of *present* circumstances, and the success or failure of *current* "active efforts" directly relevant to those circumstances, a circuit court is simply unprepared to determine that further efforts will "clearly and convincingly" qualify as "futile."

In my view, terminating an Indian parent's rights without providing any "active efforts" relevant to the parent's current situation robs the ICWA of meaning. Congress intended the ICWA to preserve Indian families, because intact Indian families represent a "resource . . . vital to the continued existence and integrity of Indian tribes." 25 USC 1901. The elevated standard of proof required by the ICWA and its insistence that "active efforts" must precede termination signal that termination of an Indian parent's rights is intended to be a procedurally painstaking process. Assumptions, presumptions, and evidentiary shortcuts have no place here. Therefore, I would reverse the circuit court's termination of respondent's parental rights, for the single reason that petitioner failed to clearly and convincingly demonstrate that it provided the active efforts required by federal law.

### C. THE EVIDENCE ESTABLISHED RESPONDENT BENEFITED FROM PRIOR SERVICES

By the time that respondent conceived Ashtyn in February 2007, she had (1) permanently ended her relationship with Perrault; (2) completed her GED; (3) obtained employment; (4) purchased a home jointly

with Roe; (5) successfully completed a drug court pro-
gram; and (6) engaged in uneventful visits with Aliyah.
This evidence unequivocally demonstrates that respon-
dent derived substantial benefit from previous services.
Although belatedly, respondent removed herself from
an exploitative relationship in which she had been
entirely dependent on her abuser, and entered into an
apparently positive relationship with a gainfully em-
ployed man. The record reveals that respondent's situ-
ation in November 2007 bore no resemblance at all to
her circumstances at the time of Daniel's death. For
these reasons, the majority's remand invitation that the
circuit court may invoke futility to again terminate
respondent's parental rights lacks any factual basis.
The existing record simply does not contain clear and
convincing evidence that the provision of additional
services would be futile.

At the termination hearing, several of petitioner's
witnesses asserted that respondent had inappropriately
become involved with Roe because he was "a convicted
sex offender." In my view, this criticism qualifies as pure
pretext. Babcock admitted that despite Roe's convic-
tion, Roe would receive services intended to preserve
his parental rights to Ashtyn. If petitioner viewed Roe
as a potentially fit and suitable father, I can discern no
basis for a conclusion that his conviction automatically
rendered respondent an unfit mother, simply on the
basis of her involvement with Roe.

The record evidence demonstrates that the circuit
court terminated respondent's parental rights prima-
rily in punishment for Daniel's death. Snyder made no
effort to conceal that Daniel's death motivated her
recommendation for termination: "[G]iven this circum-
stance of her still being only one of two people that
could have killed Danny, I mean, at the very best, she

has to know, so with [respondent], I'm definite, you know, on termination." Respondent was never formally charged with killing Daniel, or with being an accessory to his homicide. Nevertheless, the circuit court concluded that respondent's unproven role in Daniel's death, and her conduct during the four months thereafter, supplied proof beyond a reasonable doubt that respondent's custody of Ashtyn "would likely result in emotional or physical damage to the child." 25 USC 1912(f). In my view, petitioner could not possibly prove a likelihood of harm to Ashtyn *beyond a reasonable doubt* in the absence of any current information. See *In re Matthew Z*, 80 Cal App 4th 545, 552; 95 Cal Rptr 2d 343 (2000), in which the California Court of Appeals explained:

> [B]ased on the family-protective policies underlying the ICWA, it is reasonable to assume the ICWA section 1912(f) finding must be made at, or within a reasonable time before, the termination decision is made. Otherwise, it would be possible for a state to terminate parental rights when the current circumstances do not show a return to the parent's custody would be detrimental to the child's well-being. This would violate the words and spirit of the ICWA.

At its core, this case involves whether a court may conclude that a parent qualifies as presently unfit solely on the basis of the parent's past misconduct, uninformed by her current circumstances. I believe that the ICWA's "beyond a reasonable doubt" standard of proof precludes a presumption of unfitness predicated solely on past conduct. Rather, a court must engage in a meaningful examination of *present* circumstances to determine whether "the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 USC 1912(f).

"The stringency of the 'beyond a reasonable doubt' standard bespeaks the weight and gravity of the private interest affected, society's interest in avoiding erroneous convictions, and a judgment that those interests together require that society impos[e] almost the entire risk of error upon itself." *Santosky v Kramer*, 455 US 745, 755; 102 S Ct 1388; 71 L Ed 2d 599 (1982) (quotation marks and citation omitted). In the criminal law, application of the "beyond a reasonable doubt" standard requires a fact finder to "reach a subjective state of near certitude of the guilt of the accused . . . ." *Jackson v Virginia*, 443 US 307, 315; 99 S Ct 2781; 61 L Ed 2d 560 (1979). Accordingly, application of this standard under the ICWA requires a fact finder to conclude with "near certitude" that "the continued custody" of the Indian child by the parent "is likely to result in serious emotional or physical damage to the child." 25 USC 1912(f).

In *Stanley v Illinois*, 405 US 645, 651; 92 S Ct 1208; 31 L Ed 2d 551 (1972), the United States Supreme Court examined the constitutionality of an Illinois law, under which "the children of unwed fathers become wards of the State upon the death of the mother." *Id.* at 646. Peter Stanley claimed that "he had never been shown to be an unfit parent," and had been unconstitutionally deprived of his children absent a showing of unfitness. *Id.* Illinois responded that "unwed fathers are presumed unfit to raise their children and that it is unnecessary to hold individualized hearings to determine whether particular fathers are in fact unfit parents before they are separated from their children." *Id.* at 647. The Supreme Court observed that the Illinois dependency proceeding involving the Stanley children "has gone forward on the presumption that [Stanley] is unfit to exercise parental rights." *Id.* at 648. Regarding

the implicit presumption of unfitness contained within Illinois law, the Supreme Court explained:

> Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities · in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand. [*Id.* at 656-657.]

Unlike Peter Stanley, respondent *was* previously judged unfit. Unquestionably, the circumstances surrounding Daniel's death and the termination of her rights to Aliyah constitute relevant evidence regarding respondent's current parenting abilities. The circuit court, however, utilized a presumption of unfitness predicated solely on historical evidence to "disdain[]" present realities in deference to past formalities." Perhaps a fuller record might reveal that respondent *is* completely unfit to parent Ashtyn and that, in respondent's custody, Ashtyn likely would suffer serious emotional or physical harm. But a court lacks the ability to reach these conclusions with certainty beyond a reasonable doubt by relying solely on a presumption that respondent's past unfitness supplies the answer. That logic "forecloses the determinative issues of competence and care," and eviscerates petitioner's heavy burden of proving unfitness.[10]

Here, the circuit court ruled that petitioner met its burden by proving respondent's past unfitness. Petitioner presented no current evidence that respondent's custody of Ashtyn would likely harm the child. By deciding that the circuit court may consider "evidence that the provision of additional services to Finfrock

---

[10] The burden of proving parental unfitness rests on the petitioner. *In re AMAC*, 269 Mich App 533, 537; 711 NW2d 426 (2006).

would be futile," the majority endorses a meaningless reiteration of the prior proceedings. If the circuit court accepts the majority's advice that it may rely solely on evidence gleaned from respondent's past, the court inevitably will bypass the ICWA's requirement of proof beyond a reasonable doubt. When current evidence of fitness is omitted, the process is governed by presumption, not proof. I would hold that on remand, the circuit court may not rely on inferences of unfitness, unsupported by current evidence demonstrating beyond a reasonable doubt that Ashtyn faces likely harm if returned to respondent's care.

Because petitioner cannot satisfy the ICWA's reasonable doubt standard in the absence of current active efforts, which it undisputedly neglected to provide, I would reverse.