*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* QUINTANA, Minors.

UNPUBLISHED
April 18, 2024

Nos. 366579; 366580
Chippewa Circuit Court
Family Division
LC No. 16-014498-NA_

Before: CAVANAGH, P.J., and K. F. KELLY and RICK, JJ.

PER CURIAM.

In these consolidated appeals, respondent-mother and respondent-father appeal as of right the trial court's order terminating their parental rights to the minor children under MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist), and (j) (likelihood of harm if returned to parents). We affirm.

## I. FACTUAL BACKGROUND

The minor children, TQ and MQ, are Native American with tribal affiliation, and thus come within the federal Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq.*, the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq.*, and MCR 3.002.

Petitioner, the Department of Health and Human Services (DHHS), filed a petition on January 24, 2020. The petition alleged that mother and father had an extensive history of substance abuse resulting in 10 prior investigations by Children's Protective Services (CPS), and that a recent unannounced CPS visit to the parents' home resulted in the discovery of "deplorable" conditions. DHHS asked the trial court to authorize the petition, take jurisdiction over the children, and remove the children from their parents' care.

At a hearing on the petition, DHHS informed the court that the parties had reached an agreement to return the children to their parents' home with "intensive in-home treatment," and that mother and father "would be entering a plea of responsible to substance use impacting their ability to parent at the time of removal." Both parents admitted that they had substance-abuse problems that impaired or impacted their parenting abilities. The court accepted the pleas and exercised jurisdiction over the children.

-1-

Several months later, an emergency removal hearing took place. A foster-care supervisor reported as follows:

> The parents went to Tribal Court. [Father] submitted his statement. Tested positive for methamphetamine, THC and fentanyl. And [mother] appeared to be under the influence according to the Sault Tribe Police. She drove to the Tribal Police Station at the Tribal Court with the children in the car. So she was arrested for driving the vehicle.

Amanda Gill, an employee of Anishnaabek Community and Family Services (ACFS), testified at the hearing. The parties stipulated that Gill was an expert for purposes of "speak[ing] as to the child rearing processes and practices of the Sault Ste. Marie Tribe of Chippewa Indians." Gill reported that petitioner had placed the children with mother's parents and that reunification services had been offered, but they were not successful. Gill explained that concerns included substance abuse and "general stability for the household and the family," and that both parents had tested positive for "very significant and concerning substances," including methamphetamine and fentanyl, which "would greatly impact a parent's ability to properly provide care and custody of a child on a full time day to day basis."

DHHS's initial goal was reunification of the family. As the case progressed, the goal was changed first to permanent guardianship, then termination of parental rights. On appeal, mother challenges the results below on the ground that the trial court improperly declined to require two substance-abuse counselors to testify regarding her progress with certain service providers. Father in turn argues that the trial court erred by concluding that DHHS offered adequate reunification services, that continued custody with him and with mother would likely cause the children severe physical or emotional harm, and that termination of his parental rights was in the children's best interests.

## II. ANALYSIS

## A. DOCKET NO. 366579

Mother argues that the trial court erred by declining to allow two expert witnesses to testify regarding mother's progress in substance abuse treatment. She also argues that her attorney was ineffective for concurring in the objection that underlies this issue. We disagree.

Mother has affirmatively waived her claim of error by successfully urging the court to decide as it did. See *People v McCray*, 210 Mich App 9, 14; 533 NW2d 359 (1995) (a party may not request an action of the trial court and then challenge that action on appeal as erroneous). Further, mother did not challenge her attorney's effectiveness as part of the proceedings below, and thus that facet of her argument is unpreserved. See *People v Brown*, 294 Mich App 377, 387; 811 NW2d 531 (2011).

This Court generally reviews the trial court's evidentiary rulings for an abuse of discretion. *Mitchell v Kalamazoo Anesthesiology, PC*, 321 Mich App 144, 153; 908 NW2d 319 (2017). However, the affirmative waiver of objections at trial extinguishes appellate objections entirely. *People v Carter*, 462 Mich 206, 214-216; 612 NW2d 144 (2000). Regarding mother's unpreserved

claim of ineffective assistance, our review of such a challenge is limited to mistakes apparent on the existing record. *People v Fyda*, 288 Mich App 446, 450; 793 NW2d 712 (2010).

At the termination hearing, a nurse practitioner confirmed that she appeared in court to testify regarding mother and father's substance abuse treatment, but lacked the necessary releases. Counsel for DHHS claimed that "under [42 CFR] 2.61 . . . the court may order a substance abuse treatment program to disclose client records if the parents aren't willing to verbally allow [the witness] to testify." Counsel further claimed that the testimony could be introduced without a release under 42 CFR 2.63(a)(1) because the case involved "[a] circumstance where there is suspected child abuse or neglect." Counsel for father then stated:

> [*Father's Counsel*]: I would object to the testimony from this witness as to my client because I think in order to fall within any of those categories [DHHS] would have had to file a motion previous to trial. She's not done that. This is now the second day of trial. Furthermore I don't see that she would fall within any of the categories listed. Thank you.

Mother's counsel expressly agreed, stating:

> [*Mother's Counsel*]: I would concur with the objection. I think that a motion should have been filed. We should of [sic] received notice of that before trial. Also I don't believe that the exceptions . . . in the rule would apply here. We're not asking her to testify regarding child abuse. We're asking her to testify regarding treatment. And then I don't think it falls within that rule.

The trial court sustained the objections. Mother protests that this expert witness was prevented from testifying about mother's progress in her substance abuse treatment program. However, as the quoted exchange shows, it was DHHS who wished to elicit the testimony in question. The trial court sustained an objection that father's attorney interposed, which mother's attorney joined.

Later in the proceeding, a behavioral-health case manager for Bay Mills Health Center testified that she provided her clients with individual counseling as well as case management. The following exchange then took place between the witness and counsel for DHHS:

> *Q*. As part of your caseload are you working with [mother]?
>
> *A*. I was but she's been discharged.
>
> *Q*. Okay and at the time that she was discharged does that terminate the release of information that you would of [sic] had?
>
> *A*. I believe it does because everything has expired actually 'cause it's past the annual date.
>
> *Q*. Okay can you tell me why she was discharged?
>
> *A*. Lack of contact.

The witness elaborated that mother was in the hospital when discharged, and that "we had plans to get her back on my schedule, but she was ill and not feeling great so it didn't happen in time," such that reestablishing relations would require repeating the intake process. The witness stated that she was willing to work with mother again, but that "[s]he would have to call."

Mother argues that the latter witness was not asked about her knowledge of mother's efforts to comply with and take advantage of the offered services. However, given that the witness agreed that mother's discharge from her program also terminated any attendant release, the witness could testify about mother's compliance. The lack of additional questioning regarding mother's progress was responsive to the trial court's earlier decision to sustain any of mother's or father's objections to such testimony from the nurse practitioner in light of her lacking the proper releases.

Under the doctrine of invited error, a party is foreclosed from raising as error on appeal any action or decision that the party successfully advocated below. See *Vannoy v City of Warren*, 386 Mich 686, 690; 194 NW2d 304 (1972), citing 5 Am Jur 2d, Appeal and Error, §§ 713-722, pp 159-166. "A party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error." *The Cadle Co v City of Kentwood*, 285 Mich App 240, 255; 776 NW2d 145 (2009) (quotation marks and citation omitted); see also *People v Carter*, 462 Mich 206, 214-216; 612 NW2d 144 (2000) (an issue affirmatively waived at trial is extinguished and warrants no appellate consideration).

Mother alternatively argues that her counsel was ineffective for objecting to the admission of testimony from the two substance abuse treatment providers. A parent facing termination of parental rights has a right to competent counsel. *In re Simon*, 171 Mich App 443, 447; 431 NW2d 71 (1988). "In analyzing claims of ineffective assistance of counsel at termination hearings, this Court applies by analogy the principles of ineffective assistance of counsel as they have developed in the criminal law context." *Id.* Thus, a party claiming ineffective assistance of counsel must show that counsel's performance fell below an objective standard of reasonableness, and that the representation was so prejudicial as to result in deprivation of a fair trial. See *Strickland v Washington*, 466 US 668, 687-688, 690; 104 S Ct 2052; 80 L Ed 2d 674; 104 S Ct 3562; 82 L Ed 2d 864 (1984); *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994).

Mother fails to offer a persuasive argument challenging her attorney's performance under the circumstances. She offers no explanation for why she chose not to execute certain releases in the first instance, or why her attorney joined father's attorney in objecting to the presentation of attendant information. An appellant raising a claim of ineffective assistance of counsel must overcome a strong presumption that counsel's tactics were matters of sound trial strategy. See *People v Henry*, 239 Mich App 140, 146; 607 NW2d 767 (1999). We conclude that mother's counsel's vociferous objections to testimony regarding mother's (and father's) compliance with their respective substance abuse treatment plans was sound trial strategy. Mother's attorney may have thought that she had more to lose than to gain from disclosure of that information. On appeal, mother says nothing about what the witnesses at issue might have revealed at trial that her lawyer's objections overruled. Accordingly, this claim lacks merit.

B.  DOCKET NO. 366580

1.  REASONABLE EFFORTS

Father argues that the DHHS failed to make reasonable efforts to reunify him with the children.  We disagree.

"For purposes of ICWA and MIFPA, active [reunification] efforts must be proved by clear and convincing evidence."  *In re Beers/LeBeau-Beers*, 325 Mich App 653, 680; 926 NW2d 832 (2018).  "The factual findings by the trial court are reviewed for clear error, and any issue regarding the interpretation and application of the relevant federal and state statutory provisions is reviewed de novo."  *Id.*

MCL 712A.19a(2) imposes the general requirement that "[r]easonable efforts to reunify the child and family . . . be made in all cases," with some specified exceptions.  When Native American children are involved, the MIFPA adds that "[a] party seeking a termination of parental rights . . . must demonstrate to the court's satisfaction that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that the active efforts were unsuccessful."  MCL 712B.15(3).  " '[A]ctive efforts' are defined as 'actions to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and to reunify the Indian child with the Indian family.' "  *In re Beers/LeBeau-Beers*, 325 Mich App at 680, quoting MCL 712B.3(a).  Such efforts must be "affirmative, as opposed to passive, efforts," and thus involve "more than the standard 'reasonable efforts' approach."  *Id.*  They therefore require more than mere referrals to services, and instead "involve a caseworker who takes a client through the steps of a treatment plan rather than requiring the client to perform the plan on his or her own."  *Id.*

In this case, the findings adopted by the trial court included the following:

[T]he Agency has shown by clear and convincing evidence active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and that these efforts were unsuccessful.

Respondents received an exhaustive list of services to address the barriers to reunification.  Those services included: in-patient substance abuse counseling; outpatient substance abuse counseling through Sault Tribe Behavioral Health and Bay Mills Behavioral Health; transportation assistance, including rides, gas cards and bus passes; housing assistance including assistance finding a home, as well as assistance cleaning their home and moving; financial assistance; parenting education; Family Reunification program; Family Continuity program; appointment reminders; safety planning; drug screening; supervised parenting time; and pill counts.

Many of the services and rehabilitative programs provided were offered through the Tribe, including parenting education, mental health counseling, substance abuse counseling, Family Continuity, and Family Reunification.  The Agency worked to identify and overcome barriers including transportation, housing, and the parents' work schedules.

-5-

The services provided were designed to prevent the breakup of this family by addressing substance abuse, and mental health, so that the children could safely return to the home.

Amanda Gill was qualified by the court to testify as a qualified expert witness. She testified active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. She testified the services were culturally appropriate. Gill testified that the active efforts were unsuccessful. The issues that existed at the beginning of the case continue to exist, and the respondent parents failed to benefit from services.

This summary clearly describes active reunification efforts for purposes of the ICWA and MIFPA. In arguing that such active efforts were not provided, father complains generally that he and mother were only given a list of items or resources to utilize on their own without any further support. He otherwise states that multiple case workers, including Alivia Theut, Christy Roberts, and Angelique LaVake affirmatively testified that they were not providing him with services.

None of these claims are supported by the record. Regarding father's claims against Theut, the record indicates that when she took over the case, Theut attempted to gather information for the court hearing, but determined "that none of the agencies had any releases," and thus did not have "much information to give due to not being able to contact with agencies." Theut continued that, when asked to sign new releases, mother and father indicated that they "wanted to talk to their attorneys," one of whom "had advised them not to sign." Theut thus indicated not that she refused to expend active efforts at reunification, but rather that her attempts to engage the parents in services were frustrated by the parents themselves.

Father next claims that Roberts testified that she would not drive him to a mental health assessment. Roberts testified on cross-examination as follows:

*Q.* [W]hen did you receive this latest referral?

*A.* It . . . was . . . 2-7-22.

*Q.* And . . . have they asked you for any assistance to do things like transport [the older child] to an . . . appointment?

*A.* They did. That is not my role. My role is to work with [the parents]. My role is not to transport foster kids. My role is strictly with [the parents].

*Q.* So did you do anything to accommodate that transportation at all?

*A.* That would be [caseworker Mariah Derry].

*Q.* . . . So there is clearly defined roles. And did you talk to Mariah?

*A.* Yep. I actually talked to her on the phone as [the parents] were yelling at me via text.

*Q.* And the child ended up missing the appointment anyway, correct?

*A.* I have no idea.

*Q.* No particular concern. Not your role.

*A.* I don't know if he missed his appointment or not.

Contrary to father's argument, it was not a dereliction of duty to exert active efforts for Roberts to decline to provide a particular service that came under the purview of a different service provider.

Moreover, the record clearly indicates that Roberts provided, or attempted to provide, numerous other services. As was the case with Theut, mother and father stymied Roberts's attempts at offering assistance. According to Roberts:

> I met with [mother and father] for the first time. The only thing they wanted to do was my initial paperwork. They refused to talk about services as they were going to court, I believe it was the following week. They said that they would discuss services after they had went [sic] to court.
>
> The following week [father] did reach out and asked me if I would take him to draw with his probation officer. I did that. I also took [father] to fax some job applications. And check the status of a job that he had applied for. I took him back home. . . .
>
> [Father] asked if I could help him out with some cleaning supplies and some personal care items. I did tell him I would bring them back the next week. And the next week I brought them back. Knocked and knocked on the door. Their van was home. They're [sic] dog was barking. They never came to the door. I left the supplies and that was it.

Asked about other services she was able to provide, Roberts responded as follows:

> Family Continuity, and they're aware because they've done that program before. You know, I can help them with job searches. I can help them get their bills up to date. I can help them, you know, if they're struggling getting to their counseling appointments. I can help them with bus passes, gas cards, Walmart cards. I mean really I have kind of a broad spectrum of things that I can do. It's just what needs they have.

However, Roberts confirmed that mother and father had asked for only transportation on a few occasions, and for some personal items. Roberts thus well explained that the parents' lack of success with services was not the result of any failure on her part to offer active efforts.

Finally, father contends that the third case worker, Angelique LaVake, told him that he did not deserve help. However, LaVake's testimony indicated that she actively tried to help him and mother, but was sometimes thwarted by the parents themselves:

*Q.* [W]hen you took over the case did you make a request to meet with the parents?

*A.* We had already been meeting off and on.

*Q.* Okay, so you didn't set up a specific time to sit down and discuss the Case Service Plan with them?

*A.* No I did not . . . until probably after I had the case for a few weeks.

*Q.* Okay.

*A.* And then we . . . were supposed to meet and [mother] went into the hospital and I never heard from them again.

*Q.* Okay, what things had you been doing since you started having contact with the family on behalf of the agency to try to engage with them?

*A.* I did do a parenting time with them. And we tried to do drug screens. They really didn't request any services.

*Q.* Did you reach out to them by texts at any point?

*A.* That's usually how we got in contact was with a text.

*Q.* Okay, and how frequently were you reaching out to them while you had the case?

*A.* When they were in town we were talking like every—couple times a week I would say. And then when visits were suspended I gave them like two weeks. We didn't really talk. And then I talked to [mother] again and it was . . . still positive. They've never been like rude or anything to me. And I told her that I wanted to get together and she said that would be good so we were gonna get together. And at the one date that we were supposed to get together she had another appointment come up so we rescheduled for the following Tuesday, and they never showed up and never contacted me again.

*Q.* Okay, do you know where she was on that day?

*A.* I didn't know until later on. I had heard that she went into the hospital.

*Q.* Okay, so when you first received the case in November you were having texts communication with them a couple time a week.

*A.* Mm-hm.

*Q.* Were they responding when you sent them text messages?

*A.* For the most part. Sometimes they would be working, but they usually got back to me if not that day then the next day.

*Q.* Okay, and did you offer to refer them for any services?

*A.* I did not. At the time I felt that they were referred to all their services. And then we really didn't get a chance to sit down and talk about everything that they had for services.

It was not a dereliction of the duty to exert active efforts for LaVake to decline to offer services duplicative of, or beyond those, already exhaustively offered.

Moreover, although DHHS "has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). This principle applies equally when DHHS's responsibility is to expend active efforts to provide reunification services.

In this case, as noted, three service providers identified by father each explained that the parents themselves sometimes thwarted their efforts. Further, father himself admitted to willfully refusing to cooperate with service providers, having testified that he had not communicated any needs to petitioner over the past two years and had stopped responding to LaVake's text messages in order to avoid expected arguments. For these reasons, we reject the argument that DHHS failed to exert active efforts to reunify the family.

## 2. STATUTORY GROUNDS

Father next argues that the trial court erred by concluding that allowing him to retain custody of the children would likely result in serious emotional or physical harm to the children. We again disagree.

"We review for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence. A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Richardson*, 329 Mich App 232, 251; 961 NW2d 499 (2019) (citation omitted). "To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

The trial court terminated father's parental rights under MCL 712A.19b(3)(c)(*i*) and (j). Under Subsection (c)(*i*), termination is proper when "182 or more days have elapsed since the issuance of an initial dispositional order, and . . . . [t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." Under Subsection (j), termination is proper when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." Father does not challenge the trial court's findings that these two statutory grounds were established by the clear-and-

convincing-evidence standard normally applicable in termination proceedings. Instead, he makes issue of the trial court's findings under the beyond-a-reasonable-doubt standard applicable in termination cases involving children of Native American ancestry and affiliation.

The MIFPA and the ICWA both state that termination of parental rights may not be ordered without "a determination supported by evidence beyond a reasonable doubt," including testimony from expert witnesses, "that the continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the Indian child." MCL 712B.15(4); 25 USC 1912(f). Regulations implementing the ICWA include 25 CFR 23.121(b), which provides that a court may not terminate parental rights to a Native American child "unless evidence beyond a reasonable doubt is presented, including the testimony of one or more qualified expert witnesses, demonstrating that the child's continued custody by the child's parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

Here, the referee's opinion and recommendation addressed this issue as follows:

Amanda Gill, a qualified exert witness, testified that continued custody of the children by respondents would likely result in serious emotional or physical damage to the children. She testified extensive services had been offered and provided to respondents, and that respondents did not fully comply with or benefit from those services.

Respondents have a long history of substance abuse, going back at least to the time of [TQ]'s birth in 2015. There is a consistent pattern of relapse, the provision of services, and recovery. Respondents' cycle of substance abuse led to the filing of three petitions, in 2016, 2017, and 2020. The children were removed from respondents' care due to continued substance abuse even with court super-vision in 2018 and 2020. Respondents' substance abuse repeatedly put their children at risk of serious physical and emotional harm. Given the lengthy history of relapse and recovery despite the provision of extensive services, the court has no confidence respondents will be able to find and maintain sobriety in the future. [MQ] and [TQ] are young and in need of sober caretakers to ensure, at a minimum, their safety. Respondents have shown themselves incapable of prioritizing their children's safety over their use of substances.

The court finds the Agency has offered evidence that shows beyond a reasonable doubt, including the testimony of Amanda Gill, that respondent father and respondent mother's parental rights should be terminated because continued custody of the children by the respondents would likely result in serious emotional or physical damage to the children.

Father concedes that Gill was a qualified expert witness, but argues that her opinion was not based on any causal relationship between his substance-abuse problem and the risk of harm to the children. We find no merit to this argument. According to the record, mother and father both admitted that they had substance-abuse problems that impaired or impacted their parenting abilities. The petition initiating this case reported that in February 2016, "a petition for in-home jurisdiction was filed in Chippewa County" because TQ was born positive for marijuana and barbiturates, and that in May 2017, a petition was filed "seeking in-home jurisdiction of the family

due to numerous allegations related to substance abuse and improper supervision." The petition further reported that the parents' household was in such disarray that it was "not safe" for the children. Further, the August 2020 emergency-removal hearing was held as a result of concerns that father had tested positive for methamphetamine and fentanyl, and that mother appeared to be intoxicated when she drove to the Tribal Police Station at the Tribal Court with the children in the car. Gill testified at that hearing that the initial concerns in the case involved not just substance abuse, but "general stability for the household and the family." Further, the substances Gill reported that mother and father had tested positive for included methamphetamine and fentanyl, which Gill opined "greatly impact a parent's ability to properly provide care and custody of a child on a full time day to day basis."

At the termination hearing, Gill opined that in light of the parents' failure to benefit from services, removal was necessary to prevent serious harm to the children. Christy Roberts testified that mother and father admitted to relapsing in May 2021, and that the household conditions "during the relapse got worse." The trial court credited the parents for being "very good parents . . . when . . . sober," but found that "removal should be continued at this time" because they had yet to achieve sobriety. For all these reasons, father has failed to show that the trial court clearly erred by concluding, beyond a reasonable doubt, including on the basis of testimony of a qualified expert witness, that continued custody of the children with their parents would likely result in serious emotional or physical harm.

### 3. BEST INTERESTS

Finally, father argues that the trial court erred by finding that termination of his parental rights was in the children's best interests.

An appellate court reviews "for clear error . . . the court's decision regarding the child's best interest." *In re Trejo Minors*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). A finding is clearly erroneous if the reviewing court is left with the definite and firm conviction that a mistake has been made. *In re Roe*, 281 Mich App 88, 95-96; 764 NW2d 789 (2008).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). Once a statutory ground for termination has been established, the trial court must find that termination of parental rights is in the child's best interests before it can terminate parental rights. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

"In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation

history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). "A parent's substance-abuse history is also relevant to whether termination is in the child's best interests." *In re Rippy*, 330 Mich App 350, 361; 948 NW2d 131 (2019).

In this case, the findings concerning the children's best interests that the trial court adopted included the following:

> The children are young, seven and four. They have spent most of their lives under court jurisdiction, and much of that time removed from respondents' care. There is no question the children are bonded with respondents. The children are also in the care of relatives, respondent mother's sister. Those facts, however, do not outweigh these children's need for stability and permanency. The children have suffered under years of court oversight and respondents' inability to successfully address their longstanding substance abuse issues. [TQ] struggled with incontinence, having regular accidents at school and at home. His issues with incontinence finally improved with the suspension of . . . parenting time in December 2022. [MQ] struggled behaviorally, having extended tantrums, especially after visitation. [Her] behaviors also improved with the suspension of respondents' parenting time. [The parents'] conversations with the children were, at times, inappropriate. They included . . . telling the children they need to talk to their lawyer and ask him why they cannot come home. . . .

> [P]arenting time with the children was not consistent, especially over the last two years. They cancelled visits and missed visits due to incarceration. The frequency of cancelled visits increased during periods of suspected or known relapse.

> . . . The children are very well cared for by their maternal aunt . . . and her partner, who are willing to adopt. The love [the aunt] has for her sister was very evident during her testimony. [She] will allow [the parents] to have a relationship with the children if they are sober.

> The case worker Angelique LaVake, agency supervisor Jill Thompson, and Amanda Gill support termination of parental rights, as does the Sault Tribe Child Welfare Committee who voted twice (unanimously) in support of termination of parental rights. In his written closing argument, the attorney guardian ad litem weighed the relative merits of permanent guardianship versus termination, leaving the decision to the court. To be successful, the guardian ad litem stressed, [the parents] must respect and support the permanency of a guardianship. Unfortunately, the evidence suggests they will not.

> The Agency has proved, by a preponderance of the evidence, that termination of parental rights is in the children's best interests.

Father emphasizes that he and the children were strongly bonded, and also that the children had been placed with relatives. However, the trial court acknowledged both of those factors and that they generally weighed against termination, even while concluding that they did not outweigh

the "children's need for stability and permanency" after having "suffered under years of court oversight and respondents' inability to successfully address their longstanding substance abuse issues" in this case.

For the same reasons that we concluded that the trial court did not clearly err by finding that continued custody of the children with father would likely result in serious emotional or physical harm to the children, the court did not clearly err by finding that termination of father's parental rights was in the children's best interests.

## III. CONCLUSION

In Docket No. 366579 and Docket No. 366580, mother and father have failed to demonstrate error in the trial court's decision to order the termination of their parental rights.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly
/s/ Michelle M. Rick